847 F.2d 73
 56 USLW 2692, 3 Indiv.Empl.Rts.Cas. 417
 John N. ZAMBONI, Appellant,
v.
John H. STAMLER, Prosecutor of Union County, and
individually; Patrick J. Maloney, Chief of Investigations
for the Union County Prosecutor's Office and individually;
Richard P. Rodbart, Trial Supervisor for the Union County
Prosecutor's Office and individually; Edmund J. Tucker,
First Assistant Prosecutor of Union County and individually;
County of Union; Union County Prosecutor's Office.
 No. 87-5397.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 17, 1987.
Decided May 17, 1988.
 
 Patricia Breuninger (argued), Carol Kenyon, Breuninger, Hansen & Casale, Fanwood, N.J., for appellant.
 James P. Zazzali, Robert A. Fagella (argued), Christopher L. Leavey, Zazzali, Zazzali & Kroll, Newark, N.J., for appellees.
 Before GIBBONS, Chief Judge, SLOVITER, and COWEN, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 John N. Zamboni, a detective in the Union County Prosecutor's Office, filed suit under 42 U.S.C. Sec. 1983 against the Union County Prosecutor and others alleging that they had taken various disciplinary actions against him in retaliation for his expression of opposition to changes in certain personnel policies and procedures in the prosecutor's office. Zamboni claimed that the retaliation violated his First Amendment rights. The district court granted the defendants' motion for summary judgment and dismissed Zamboni's complaint on the ground that Zamboni's expressions were not on a matter of public concern and hence were outside the ambit of First Amendment protection. The court also dismissed Zamboni's pendent claims under state law. The issues on appeal require us to consider both the First Amendment rights of public employees and the parameters of the New Jersey common law torts of wrongful discharge and intentional infliction of emotional distress.
 
 I.
 Facts
 
 2
 John N. Zamboni is a detective with the rank of lieutenant in the Union County Prosecutor's Office, where he has been employed for over twenty years. Defendant John H. Stamler is the Prosecutor of Union County and is the highest law enforcement officer in Union County.
 
 
 3
 The organization of the investigative staff of the Union County Prosecutor's Office is governed by the New Jersey County Detectives and County Investigators Act, N.J. Stat. Ann. Secs. 2A:157-1 et seq. (West 1985) (the Act). The Act contemplates two categories of investigative officers, detectives and investigators, who perform essentially the same duties. Compare id. Sec. 2A:157-2 with id. Sec. 2A:157-10. The Act specifies the number, title, and salaries of superior officers within the detective ranks, id. Secs. 2A:157-3 to -9, but is silent as to superior officers within the investigative class.
 
 
 4
 Detectives are in the classified branch of the civil service, id. Sec. 2A:157-2, and, therefore, their appointment and promotion must be "made according to merit and fitness to be ascertained, as far as practicable, by examination." N.J. Const. art. VII, Sec. 1, para. 2; see also New Jersey Civil Service Act, N.J. Stat. Ann. Secs. 11:1-1 et seq. (West 1976) (the then applicable civil service provisions for appointment, promotion, termination, and working conditions of civil servants).[1] Investigators, on the other hand, are not in the classified civil service; their appointment and promotion is within the sole discretion of the prosecutor who may, for example, remove an investigator at any time and for any reason. See N.J. Stat. Ann Sec. 2A:157-10; Muccio v. Cronin, 135 N.J. Super. 315, 343 A.2d 158 (Law Div.1975).
 
 
 5
 In late 1982, Stamler announced his intention to reorganize the prosecutor's office. Promotions thereafter would be made only from among the unclassified investigators. Superior officer positions within the investigator branch would be established to parallel those statutorily designated in the detective branch. Any detective who sought a promotion was instructed to take a leave of absence from the classified service, request a change in job classification to county investigator, join the investigators' staff, and then seek a promotion in the newly-established superior ranks of the investigator staff. If not so promoted, s/he could return to the classified service at the expiration of the leave of absence.
 
 
 6
 In compliance with the reorganization plan and in hopes of being promoted, Zamboni, like many of the other detectives in the prosecutor's office, requested both a leave of absence from his position as lieutenant of detectives and an appointment as lieutenant of investigators. He contends that at this time he also expressed his dissatisfaction with the plan to Stamler in a private meeting.
 
 
 7
 Nineteen investigators in the prosecutor's office, but not Zamboni, were promoted effective March 1, 1983 pursuant to the new procedure. Zamboni, retaining his rank of lieutenant, was transferred from a supervisory position as Commander of the Welfare Fraud Unit to a non-supervisory position in the Trial Unit, where he was responsible for helping assistant prosecutors prepare for trial by serving subpoenas and arranging for witnesses to appear.
 
 
 8
 The New Jersey Department of Civil Service describes the duties of a lieutenant of detectives as including the "supervis[ion of] a number of county detectives and investigators." App. at 155. Upon his transfer, Zamboni wrote a letter to Stamler requesting an assignment to a position with supervisory authority. He also began publicly to criticize Stamler's reorganization plan. First, he wrote a six-page letter to the Civil Service Commission dated March 8, 1983 which began: "I would like to bring to your attention a situation involving non-conformance to the duties and responsibilities relating to job classification as set forth by the Civil Service Commission." App. at 76. Zamboni complained about, inter alia, "the prosecutor's purposeful attempt to subvert the Civil Service System and carry out his own plans, without regard to the law," App. at 80, and Zamboni's own transfer to the Trial Unit, which he claimed was an "abuse of Civil Service Regulations concerning the assignment of work according to Title and Classification" in that he was working without supervisory duties and therefore out of title. App. at 81.
 
 
 9
 The Civil Service Commission's initial determination was unfavorable to Zamboni. Zamboni appealed that determination to the Division of Appellate Practices and Labor Relations of the Department of Civil Service in another letter dated August 19, 1983, in which he made clear that he was not claiming entitlement to receive a promotion in the unclassified ranks, but rather that "the arbitrary and capricious manner in which this situation has been handled by the Prosecutor violates the basic tenets of Civil Service law, and therefore my rights as well." App. at 93.
 
 
 10
 Unsuccessful administratively,[2] Zamboni then turned to the New Jersey courts. His complaint asserted that the reorganization plan violated the civil service laws "in that defendants have circumvented established guidelines for the promotion of individuals in the classified service." App. at 88-89. Zamboni asked the court for an adjudication that the promotion plan was unlawful and for an order directing the defendants to, inter alia, cancel all promotions made under the new plan and cease requiring Zamboni to perform duties that were outside of his job title. The Law Division, affirmed by the Appellate Division of the Superior Court, sustained Stamler's authority to make the promotions at issue. Zamboni v. Stamler, 194 N.J.Super. 598, 477 A.2d 449 (Law Div.1984), aff'd, 199 N.J.Super. 378, 489 A.2d 1169 (App.Div.1985).[3]
 
 
 11
 Zamboni contends in the present lawsuit filed in federal court in April 1985 under 42 U.S.C. Sec. 1983 that from the time that he began to protest Stamler's reorganization plan he was subjected to numerous disciplinary actions, including his transfer to the Trial Unit; a four-day suspension without pay for failing to keep accurate records while in the Welfare Fraud Unit; a $100 fine for insubordination for using office stationery to write his complaint to the Civil Service Commission; orders to turn in his gun and submit to a psychiatric exam due to his "attitude" problems; and numerous written reprimands for, for example, failing to say "Good Morning" to Stamler, sending a memo directly to Stamler rather than through the chain of command, asking an assistant prosecutor about his (Zamboni's) state court case during office hours, and not being able to be located during work hours.
 
 
 12
 Zamboni names as defendants Stamler, certain other officials of Stamler's staff, the County of Union, and the Union County Prosecutor's Office (hereinafter collectively referred to as "Stamler"). Zamboni alleges that the disciplinary actions were taken in retaliation for his criticism of the reorganization plan, thereby violating his First and Fourteenth Amendment rights and giving rise also to the state law torts of wrongful retaliation and intentional infliction of emotional distress. Notwithstanding that for the purposes of their summary judgment motion defendants conceded and the district court assumed that these disciplinary measures not only occurred, but also were taken in reprisal for Zamboni's outspoken opposition to the reorganization plan, the district court granted Stamler's motion for summary judgment and dismissed the complaint with prejudice. Zamboni v. Stamler et al., slip op., No. 85-1748 (D.N.J. June 10, 1987). Zamboni appeals.[4] We have jurisdiction over the order of the district court pursuant to 28 U.S.C. Sec. 1291 and our review is plenary. See Gans v. Mundy, 762 F.2d 338, 340 (3d Cir.), cert. denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).
 
 II.
 First Amendment Protected Speech
 A.
 
 13
 Nearly a century ago, in flatly rejecting a public employee's First Amendment claim, Justice Holmes wrote: "[A policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 220, 29 N.E. 517, 517 (1892). Twentieth century jurisprudence has accorded public employees substantially more First Amendment protection than Justice Holmes contemplated. From Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), to Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Supreme Court has sought to prevent "a State [from] condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142, 103 S.Ct. at 1687. On the other hand, because the state may have an interest as an employer in regulating the speech of its employees, the judicial task is to strike a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35.
 
 
 14
 Accordingly, the threshold inquiry is whether Zamboni's speech is protected, which first entails a determination of whether his expressions may be "fairly characterized as constituting speech on a matter of public concern," Connick, 461 U.S. at 146, 103 S.Ct. at 1689, because when a public employee speaks "upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum" for review. Id. at 147, 103 S.Ct. at 1690. Whether the speech is on a matter of public concern is a legal determination, to be "determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48 & n. 7, 103 S.Ct. at 1690 & n. 7 (footnote omitted). See generally Parker, Free Expression and the Function of the Jury, 65 B.U.L. Rev. 483, 510-24 (1985). Our review is therefore plenary.
 
 
 15
 The thrust of Zamboni's speech related to his opposition to Stamler's reorganization plan and, in particular, to how promotions were to be made under that plan. That opposition raised significant issues concerning, inter alia, whether the county prosecutor had impermissibly circumvented the civil service laws, the role of civil service employees in the county prosecutor's office, and the manner in which the county prosecutor, the county's highest law enforcement official, performed his administrative functions. The New Jersey Superior Court characterized Zamboni's state law challenge as "rais[ing] significant issues regarding the authority of county prosecutors to make appointments to positions of superior officers in the investigative staff in the unclassified service." Zamboni v. Stamler, 194 N.J. Super. 598, 600, 477 A.2d 449, 450 (Law Div.1984), aff'd, 199 N.J. Super. 378, 383, 489 A.2d 1169, 1172 (App.Div.1985).
 
 
 16
 This court has repeatedly found that public employees' criticism of the internal operations of their places of public employment is a matter of public concern. Most recently, in Rode v. Dellarciprete, 845 F.2d 1195, (3d Cir.1988), a case raising similar issues to those before us, we held that a civilian employee of the Pennsylvania State Police who spoke to a reporter concerning her personnel problems and allegations that she was being harassed because of racial animus "was speaking on a matter of public concern." Id., at 1201; see also Czurlanis v. Albanese, 721 F.2d 98 (3d Cir.1983) (county auto mechanic's criticism at public county board meeting of the internal management of the Department of Motor Vehicles); Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216 (3d Cir.1980) (professors' criticism of university president's efforts to increase faculty/student ratio), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981); Monsanto v. Quinn, 674 F.2d 990 (3d Cir.1982) (tax department employee's letters to tax commissioner expressing dissatisfaction with operation and management of the Tax Division).
 
 
 17
 Stamler argues, however, that Zamboni's speech does not involve a matter of public concern because, in opposing the reorganization plan, Zamboni had a "singular purpose--to invalidate a promotional plan which was adverse to him." Appellees' Brief at 15. The district court, relying on Murray v. Gardner, 741 F.2d 434 (D.C. Cir.1984), cert. denied, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985),[5] likewise deemed fatal to Zamboni's First Amendment claim its finding that his "primary motivation was to contest his failure to be promoted and his transfer to the Trial Unit." Zamboni v. Stamler, et al., No. 85-1748, slip op. at 13 (D.N.J. June 10, 1987).
 
 
 18
 While it is uncontested that Zamboni had a personal stake in the speech at issue, our opinion in Rode makes clear that Zamboni's motivation is "merely one factor to be considered, but not necessarily controlling, in assessing the character of [the employee's] speech." Rode, at 1201. Judge Rosenn, writing for the court in Rode, stated that "complete reliance" on the employee's motivation in speaking is inappropriate. Id. In Connick, the Supreme Court held that one of the questions posed by the assistant district attorney's inter-office questionnaire was of public concern, even though the other questions were "mere extensions of [her] dispute over her transfer." Connick, 461 U.S. at 148, 103 S.Ct. at 1690. Were motivation rather than content dispositive, the Court would have had no reason to isolate the one question that was of public concern from all the others. Indeed, it is unlikely that any employee who lacks a personal interest in the subject that gives rise to the speech in question would file a lawsuit to vindicate his or her First Amendment rights.
 
 
 19
 It is also relevant in determining the character of Zamboni's speech that the comments he alleges precipitated the retaliatory actions were made not only in a private meeting with Stamler but also to the appropriate officials who were in a position to redress the actions of the prosecutor that Zamboni challenged. Zamboni wrote to the Civil Service Commission, appealed to the appropriate administrative body, and filed a lawsuit. In all of these expressions, Zamboni referred to the policy issue as well as to his personal complaint. We therefore hold as a matter of law that Zamboni's speech was speech that was on a matter of public concern.
 
 B.
 
 20
 It then becomes necessary to ascertain whether Zamboni's speech caused such interference with "the effective functioning of the public employer's enterprise" as to justify the action taken in response. Rankin, 107 S.Ct. at 2898-99. This balancing, required by Pickering, 391 U.S. at 568, 88 S.Ct. at 1734, is also a legal determination. See Pennekamp v. Florida, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946)) ("we are compelled to examine for ourselves the statements in issue and the circumstances under which they were made to see whether or not they ... are of a character which the principles of the First Amendment ... protect"); see also Rankin, 107 S.Ct. at 2897.
 
 
 21
 Although the court in Rode was able in the first instance on appeal to determine that Rode's exercise of free speech "did not impermissibly affect the State's interest in the efficiency and performance of the [police]," Rode, at 1202, in this case the record is insufficiently developed on the disruption issue. We will therefore remand to the district court for it to consider whether Zamboni's speech caused any disruption in Stamler's office and, if so, whether that disruption was so severe as to override both Zamboni's and society's First Amendment interests. In the interests of judicial economy and in order to guide the district court in its determination of this matter, we discuss briefly the relevant issues to be addressed.
 
 
 22
 At the outset, we reject Stamler's suggestion at oral argument that a finding of potential disruption could be sufficient to outweigh Zamboni's interests. To the contrary, in cases such as this involving speech on matters of significant public concern, a showing of actual disruption is required. See American Postal Workers Union v. United States Postal Service, 830 F.2d 294, 303 & n. 12 (D.C.Cir.1987). In Pickering, for example, where the Supreme Court held that a teacher's interest in expressing his criticism of the fiscal policies of the Board of Education was stronger than the Board of Education's in not having him speak, the Court noted that the teacher's speech was "neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily activities in the classroom or to have interfered with the regular operation of the schools generally." 391 U.S. at 572-73, 88 S.Ct. at 1737 (footnote omitted); see also Rankin, 107 S.Ct. at 2899; Trotman, 635 F.2d at 230.
 
 
 23
 Defendants ask us to decide as a matter of law from this record that Zamboni's admitted actions in failing to say "Good Morning" to Stamler and referring to him as "your boss" rather than "my boss" present sufficient potential for disruption to override Zamboni's First Amendment right to speak on a matter of public concern. We reject Stamler's argument. The free speech right protected by our Constitution is not so ephemeral.
 
 
 24
 Moreover, a finding of actual disruption, while necessary, is not sufficient to a determination that the employee's speech is not protected. As we stated in Czurlanis, " '[t]he First Amendment balancing test [of Pickering ] can hardly be controlled by a finding that disruption did occur.... The point is simply that the balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales.' " 721 F.2d at 107 (quoting Porter v. Califano, 592 F.2d 770, 773-74 (5th Cir.1979)). In considering whether any disruption was, in fact, material and substantial, consideration of Zamboni's role in the office will be important. See Rankin, 107 S.Ct. at 2900. In particular, the district court will have to determine whether Zamboni's functional role in the prosecutor's office was of such proximity to Stamler that his speech destroyed "a needed close working relationship." Czurlanis, 721 F.2d at 106; see also Sprague v. Fitzpatrick, 546 F.2d 560, 565 (3d Cir.1976), cert. denied, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977).[6]
 
 
 25
 Furthermore, in evaluating the disruption, if any, that resulted from Zamboni's criticisms of Stamler's reorganization plan, the district court must consider whether any unrest was caused directly by Zamboni's speech or whether it was exacerbated by defendants' actions. Here, Zamboni contends that it was defendants themselves who created disruption, if any, by spreading Zamboni's challenge among the members of the office, ordering other employees not to associate with Zamboni, and engaging in petty recriminations which were made the subject of general knowledge within the office. See Rode, at 1202; Czurlanis, 721 F.2d at 107.
 
 
 26
 Accordingly, we will remand this matter to the district court to determine whether Zamboni's speech caused such actual and substantial disruption of the prosecutor's office as to justify the retaliatory measures taken against him.[7] If the court finds that the speech was protected after engaging in the Pickering balance, there would remain for disposition defendants' claim that they would have taken the same actions against Zamboni in any event. This is an issue for the jury. See supra, note 6.
 
 III.
 Tort Liability
 A.
 
 27
 Intentional Infliction of Emotional Distress
 
 
 28
 Turning to the pendent claims, Zamboni challenges the district court's holding that the allegations which formed the basis of his claim for intentional infliction of emotional distress were insufficient as a matter of law. The relevant provision of the Restatement (Second) of Torts Sec. 46, which the New Jersey courts have adopted, provides:
 
 
 29
 Sec. 46. Outrageous Conduct Causing Severe Emotional Distress.
 
 
 30
 (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it for such bodily harm.
 
 
 31
 New Jersey courts have recognized a claim for intentional infliction of emotional distress where a physician knowingly and untruthfully told parents that their son was suffering from cancer, Hume v. Bayer, 178 N.J. Super. 310, 428 A.2d 966 (Law Div.1981), and a possible claim where a hospital was unable to locate the body of dead baby for three weeks, Muniz v. United Hospitals Medical Center, 153 N.J. Super. 79, 379 A.2d 57 (App.Div.1977). See generally Polito v. Continental Casualty Co., 689 F.2d 457, 464 (3d Cir.1982) (tracing New Jersey law).
 
 
 32
 Zamboni alleges that Stamler engaged in such constant harassment of him that the workplace became oppressive, resulting in Zamboni's development of a painful and chronic spastic colon and psychological and emotional problems. We do not deprecate the toll that petty vindictive behavior by an employer can wreak on vulnerable employees. However, even if Zamboni's allegations are true, which the district court assumed arguendo, we believe that the New Jersey courts would hold that the conduct alleged does not rise to the level required for the tort of intentional infliction of emotional distress. We make such a prediction based on the New Jersey court's definition of such a tort as contemplating conduct so extreme and outrageous "as to go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community." Hume v. Bayer, 178 N.J.Super. at 314-15, 428 A.2d at 968 (quoting Restatement (Second) of Torts Sec. 46 comment d (1965)). Accord Polito, 689 F.2d at 464. It follows that the district court did not err in dismissing this claim.
 
 B.
 Wrongful Retaliation
 
 33
 We find it more difficult to predict how the New Jersey courts would treat Zamboni's contention that because Stamler's retaliatory conduct violated the public policy of New Jersey, he may maintain a tort claim under the New Jersey line of cases upholding a cause of action for wrongful discharge. See, e.g., Lally v. Copygraphics, 85 N.J. 668, 428 A.2d 1317 (1981) (employee dismissed for filing workers' compensation claim); Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980) (recognizing tort but holding it inapplicable to physician discharged for refusing to work on certain drug research). The district court rejected this claim on the ground that it would be inappropriate to expand the scope of the tort recognized in these cases to encompass a situation other than that involving discharge or disciplinary action that was virtually equivalent to discharge.
 
 
 34
 As a federal court exercising jurisdiction over this pendent state claim, we are obliged to predict how the New Jersey Supreme Court would decide were it presented with the issue. See West v. American Tel. & Tel. Co., 311 U.S. 223, 236-37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). In the absence of explicit guidance from the New Jersey Supreme Court, we "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue." McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 663 (3d Cir.), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Moreover, we must "be sensitive to the doctrinal trends of the state ... and the policies which inform the prior adjudication by the state courts." Becker v. Interstate Properties, 569 F.2d 1203, 1206 (3d Cir.1977) (footnote omitted), cert. denied, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978).
 
 
 35
 Although the wrongful discharge tort is indubitably a relatively new cause of action in New Jersey, it has been ungrudgingly accepted. In Pierce, where the wrongful discharge cause of action was first recognized, the New Jersey Supreme Court emphasized that "[t]his Court has long recognized the capacity of the common law to develop and adapt to current needs." 84 N.J. at 71, 417 A.2d at 511. The Court explained that it was necessary to balance the interests of the employees in knowing they will not be discharged for exercising their legal rights, the interests of employers in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy, and the public interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees. Id. at 71, 417 A.2d at 511.
 
 
 36
 More recently, in Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985), the New Jersey Supreme Court extended judicial protection to at-will employees from dismissal without cause when the company's employment manual contained a promise that the employees would only be dismissed for cause. In so doing, the Court described the trend in New Jersey from Pierce forward that supported its holding:
 
 
 37
 No longer is there the unquestioned deference to the interests of the employer and the almost invariable dismissal of the contentions of the employee. Instead ... this Court [is] no longer willing to decide these questions without examining the underlying interests involved, both the employer's and the employees', as well as the public interest, and the extent to which our deference to one or the other serve[s] or disserve[s] the needs of society as presently understood.
 
 
 38
 Woolley, 99 N.J. at 291, 491 A.2d at 1261; see also Herring v. Prince Macaroni of New Jersey, Inc., 799 F.2d 120, 123-24 (3d Cir.1986) (predicting that New Jersey would extend Lally right of action for discharge in retaliation for filing workers' compensation claims to contractual employees covered by collectively bargained "just cause" clauses). In Kass v. Brown Boveri Corp., 199 N.J. Super. 42, 55, 488 A.2d 242, 249 (App.Div.1985), the court, relying on Pierce, held that an employee who resigned could nonetheless maintain a breach of contract action and stated that "to permit plaintiff's employer to use the resignation to bar liability for its breach of contract would offend the interests of justice."
 
 
 39
 Moreover, because the New Jersey Supreme Court in Pierce followed a California decision, see Pierce, 84 N.J. at 68-69, 417 A.2d at 510 (citing Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980)), it is of some significance that a California case recently extended the scope of the wrongful discharge cause of action to retaliatory disciplinary conduct that fell short of discharge. See Garcia v. Rockwell International Corporation, 187 Cal.App.3d 1556, 1562, 232 Cal.Rptr. 490, 493 (1987) ("The same wrongful conduct is involved whether the retaliation inflicted is a six-month suspension without pay or a discharge.").
 
 
 40
 Zamboni alleges that Stamler imposed on him a de facto demotion when he was transferred to the Trial Unit, a four-day suspension without pay, a $100 fine, and a series of minor disciplinary actions. Stamler contends that if we accept Zamboni's proposition that such actions are cognizable as a tort, "each and every minor disciplinary action by an employer ... would be subject to employee claims of retaliatory action." Appellees' Brief at 36. There is some force to Stamler's argument. We predict, based on the balance of interests referred to in Pierce, 84 N.J. at 71, 417 A.2d at 511, that the New Jersey Supreme Court would confine the tort of unlawful retaliation to formal personnel actions that have an effect on either compensation or job rank, and would exclude therefrom the majority of disciplinary actions and harassment alleged by Zamboni.
 
 
 41
 If only termination were cognizable an employer could retaliate against an employee for his or her protected speech with an almost equally harsh sanction of a demotion or suspension. The district court stated that the tort claim was limited to "discharge or disciplinary action taken that was virtually equivalent to discharge." App. at 43. It is unclear whether the district court would have considered any demotion or suspension as cognizable. Accordingly, although we are skeptical that the de facto demotion and four-day suspension alleged by Zamboni meet the standard set forth above for the tort of unlawful retaliation, we are unwilling at this stage of the proceeding to cut off at the pass Zamboni's attempt to so prove. The district court may consider this issue on remand. Moreover, as a practical matter, the damages flowing from this tort, if proven, appear to be indistinguishable from those that would flow from the First Amendment claim, which is not limited to termination. See Bennis v. Gable, 823 F.2d 723, 731-32 (3d Cir.1987).
 
 
 42
 Stamler argues that even if New Jersey recognizes a tort of wrongful retaliation short of discharge, we should affirm the dismissal of Zamboni's claim because the retaliatory action did not violate a clearly expressed public policy of the state.
 
 
 43
 In Pierce, the New Jersey Supreme Court described the relevant sources of public policy to support a wrongful discharge claim as including "legislation; administrative rules, regulations or decisions; and judicial decisions." 84 N.J. at 72, 417 A.2d at 512. Significantly, after Zamboni filed this suit, New Jersey enacted a specific provision protecting civil service employees from "any action ... [taken] in retaliation for an employee's lawful disclosure of information on the violation of any law or rule, governmental mismanagement or abuse of authority." N.J.Stat.Ann. Sec. 11A:2-24 (West Supp.1987) (emphasis added). We view the legislature's action, which is consistent with other statutory provisions barring retaliation against workers in a variety of contexts,[8] as reflective of existing public policy disapproving retaliation in whatever form against a civil servant who exposes a possible abuse of authority by a governmental official. Although section 11A:2-24 does not explicitly provide a private right of action, the absence of such a provision in the workers' compensation statute did not prevent the New Jersey Supreme Court in Lally from sustaining an action based on retaliation. In fact, the Court stated that "[t]he statutory declaration of the illegality of such a discharge underscores its wrongful and tortious character for which redress should be available." 85 N.J. at 670, 428 A.2d at 1318.
 
 
 44
 Stamler's retaliatory actions, if proven, contravened not only the public policy prohibiting reprisals against civil service employees for disclosing improprieties, but also the First Amendment of the United States Constitution; the liberty of speech and freedom of assembly clauses of the New Jersey Constitution, N.J. Const. art. 1, paras. 6, 18; and the decisions of the New Jersey courts that demonstrate New Jersey's commitment to the freedom of expression rights of its public employees. See e.g., Hall v. Mayor of Pennsauken, 176 N.J. Super. 229, 422 A.2d 797 (App.Div.1980); Ramirez v. County of Hudson, 167 N.J. Super. 435, 400 A.2d 1230 (Ch.Div.1979). We therefore reject Stamler's claim that Zamboni failed to allege a violation of a "clear mandate of public policy" to support a tort action for wrongful retaliation.
 
 IV.
 Conclusion
 
 45
 For the reasons set forth above, we will reverse the order of the district court granting summary judgment to the defendants and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 The New Jersey Civil Service Act, codified at N.J.Stat.Ann. Secs. 11:1-1 et seq. (West 1976), was repealed, in large part, effective September 25, 1986, at which time the provisions of N.J.Stat.Ann. Secs. 11A:1-1 et seq. became effective
 
 
 [2]
 In an apparently unrelated action, in 1987 the New Jersey Department of Personnel, the executive office charged with enforcing the civil service laws under the revised civil service statute, see N.J. Stat.Ann. Secs. 11A:2-8 to -13, after conducting a desk audit on Zamboni's position and discovering that he did not have any supervisory responsibilities, determined that the civil service rules did not permit him to be classified under the title of lieutenant. The Department of Personnel therefore wrote a letter to Stamler stating that Zamboni was reclassified under the title of County Detective and that Stamler was either to institute the appropriate demotional procedures or assign Zamboni to the "performance of duties commensurate with the specification for Lieutenant of County Detectives." App. at 153. It is unclear from the record what action, if any, Stamler took in response
 
 
 [3]
 The Superior Court consolidated Zamboni's action with that of three other detectives in the prosecutor's office who did not apply for leaves of absence and were therefore not ever considered for promotion. The claims of those detectives are not at issue here
 
 
 [4]
 On appeal, Zamboni has abandoned his arguments under the Fourteenth Amendment and we therefore do not review the district court's grant of summary judgment on that issue
 
 
 [5]
 In Murray, plaintiff's speech concerned a furlough lottery instituted to determine which employees were to be laid off. The court held this "was purely a labor relations matter, an arrangement of employees under which some would win and some would lose." 741 F.2d at 438. Because the Murray facts are substantially different from those before us, we have no occasion to comment on how that case would be decided under this court's precedent
 
 
 [6]
 Because Stamler conceded for the purposes of the summary judgment motion that "all of these disciplinary actions about which Zamboni complains were in reprisal for his opposition to the reorganization plan and its ramifications upon him," Appellees' Brief at 7, we do not reach the issue of whether the protected activity was a substantial or motivating factor in the actions taken against Zamboni, or whether the same actions would have been taken even had Zamboni not engaged in protected conduct. See Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216, 224 (3d Cir.1980), cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981). We note that these inquiries, which follow a determination that speech is protected, are for the jury. See Johnson v. Lincoln University, 776 F.2d 443, 454 (3d Cir.1985)
 
 
 [7]
 In addition to their other arguments, the individual defendants assert that they are immune from suit in their individual capacities under the qualified immunity doctrine of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Although the district court did not reach this issue, the defendants argue that "[t]he question of a public official's qualified immunity is ... purely a question of law" which this court should determine. Appellee's Brief at 45-46. Defendants' argument that Zamboni's First Amendment rights were not clearly established at the time the action occurred cannot be sustained in light of this court's line of precedent on public employees' protected speech. See, e.g., Czurlanis v. Albanese, 721 F.2d at 107; Trotman v. Board of Trustees of Lincoln University, 635 F.2d at 224-25. In Bennis v. Gable, 823 F.2d 723, 733 (3d Cir.1987), we stated that "as of 1982 the law was 'clearly established' that a public employee could not be demoted in retaliation for exercising his rights under the first amendment," and rejected defendants' qualified immunity claim in the political patronage context
 
 
 [8]
 See, e.g., N.J.Stat.Ann. 2A:65A-3 (West 1987) (refusing to perform abortions); N.J.Stat.Ann. Sec. 10:5-12(d) (West Supp.1987) (prohibiting employers from taking any reprisals against employees for, inter alia, opposing unlawful discriminatory acts or filing complaints under the New Jersey Law Against Discrimination); N.J.Stat.Ann. Sec. 34:5A-17 (West Supp.1987) (exercising rights under the laws governing hazardous substances in the work place); N.J.Stat.Ann. Sec. 34:6A-45 (West Supp.1987) (exercising rights under the laws governing occupational safety and health); N.J.Stat.Ann. Sec. 34:15-39.1 (West Supp.1987) (claiming worker's compensation benefits)