968 F.2d 393
 76 Ed. Law Rep. 332
 Phyllis J. SANGUIGNI, Appellant,
v.
PITTSBURGH BOARD OF PUBLIC EDUCATION, a municipal
corporation and entity; William Fisher, individually and in
his capacity as Principal of Taylor Allderdice High School;
Richard Wallace, individually and in his capacity as
Superintendent of the Pittsburgh Public Schools; Lee B.
Nicklos, individually and in her capacity as Director of
Personnel of the Pittsburgh Board of Public Education; Ann
Bihary, individually and in her capacity as Vice Principal
of Taylor Allderdice, Appellees.
 No. 91-3491.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 23, 1992.
Decided July 1, 1992.
 
 Edward A. Olds (argued), Pittsburgh, Pa., for appellant.
 P. Daniel Altland (argued), Cleckner and Fearen, Harrisburg, Pa., for appellees.
 Before: STAPLETON, SCIRICA, and ALITO, Circuit Judges.
 OPINION OF THE COURT
 ALITO, Circuit Judge:
 
 
 1
 Phyllis J. Sanguigni, a public high school teacher, filed this action against the school board and various school officials, alleging that she had lost her coaching positions and had been penalized in other ways for publishing certain statements in a faculty newsletter. She asserted First Amendment and due process claims, as well as pendent state claims. The district court dismissed her complaint for failure to state a claim. We hold that the statements in question do not pertain to matters of "public concern" under Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and related cases and that Sanguigni did not adequately allege that she had a property interest in her coaching positions. We therefore affirm.
 
 I.
 
 2
 These are the relevant facts that were alleged in the complaint.[1] Sanguigni is a tenured health and physical education teacher at Taylor Allderdice High School in Pittsburgh. While at Taylor Allderdice, Sanguigni has coached various athletic teams and has been president of the Faculty Association, an organization of Taylor Allderdice staff members. According to Sanguigni's complaint, the Association "had been primarily a social group" but has "broadened [its] purpose" and "has become responsive to professional problems facing the professional and non-professional staff." App. at 8a.
 
 
 3
 The statements that form the basis of Sanguigni's complaint appeared in an April 1989 edition of the Association's newsletter, the "Faculty Update." A copy of this publication was appended as an exhibit to Sanguigni's complaint. Because we must assess "the content, form, and context" of Sanguigni's statements, Connick, 461 U.S. at 147-148, 103 S.Ct. at 1690-91, we must describe the newsletter in some detail.
 
 
 4
 The newsletter was a one and one-half page typewritten document, consisting of nine paragraphs. Paragraph one expressed sympathy for several staff members whose relatives had died. Paragraph two recounted that Mrs. Barbara Shuty had received the "extra effort button" and requested recommendations for future "extra effort button" recipients. Paragraph three, which contained the statements at issue in this case, read as follows:
 
 
 5
 We offered a few months back a bit on RETIREMENT WITH DIGNITY ... it seems we need to add another moral support pitch for all concerned. Believe us if you or any staff member needs support to make your day at ALLDERDICE, feel free to contact an officer of the ASSOCIATION ... It again has been called to our attention staff members are being put under undue stress. There must be a way to CORRECT this situation. We can not understand why some fellow teachers have had such bad luck this year and leave the building with such low esteem. We want you to know this issue is one of our priorities in making the difference this year at ALLDERDICE. If you can help us get to the bottom of the problem, PLEASE, PLEASE see us NOW. We want you to be a part of the good that exists here at ALLDERDICE. Maybe we can take the words of Thomas Jefferson and rephrase them for us now ... "the care of human life and happiness and NOT THEIR DESTRUCTION the first and only legitimate object of good government" ... good teaching, good education, good conferences???
 
 
 6
 App. at 10a.
 
 
 7
 Paragraph four listed the March bingo winners and discussed plans for the upcoming "April showers bingo." Paragraph five admonished staff members to submit their menu selections for the June faculty luncheon and to join the PTA. Paragraph six congratulated Mr. Joe Foytick for winning employee-of-the-month honors. Paragraph seven advised any employees considering retirement to notify an Association officer so that the Association can "make [the employee's last] day special." Paragraph eight discussed nominations for Association officers, and paragraph nine thanked the Sunshine Committee. The newsletter was signed by Sanguigni and three others.
 
 
 8
 Sanguigni's complaint alleged that she had written paragraph three, which was quoted above, "to state her opposition to the pattern of harassment, oppression and retaliation that exists in the school, and encourage the organization of opposition to and collective action against such unlawful conduct." The complaint charged that in recent years faculty morale has been poor because Principal William Fisher, assisted by Vice Principal Ann Bihary, has made false retaliatory accusations of misconduct against any teacher who criticized Fisher. The complaint alleged that Fisher's conduct is condoned and encouraged by the Pittsburgh Board of Education, its superintendent, Richard Wallace, and its director of personnel, Lee Nicklos.
 
 
 9
 The complaint alleged that Fisher and Bihary "understood the statements in the newsletter as criticisms of them" and that they immediately attacked Sanguigni in retaliation. According to the complaint, Fisher, with Wallace's encouragement, gave Sanguigni unsatisfactory ratings for her performance as basketball and softball coach during the 1988-1989 school year and eventually removed her from her coaching positions. The complaint further charged that Fisher and Bihary continuously harassed and threatened Sanguigni, causing her much stress and anxiety. Moreover, Sanguigni alleged, Fisher gave her a "satisfactory/below average" rating for her teaching performance during the 1989-1990 school year and appeared bent on causing her to quit or be fired from her teaching position. Sanguigni stated that she complained about this unfair treatment to Nicklos but that Nicklos ignored her evidence.
 
 
 10
 Sanguigni filed this action in the district court against the Pittsburgh Board of Education, Fisher, Wallace, Nicklos, and Bihary, alleging that the defendants had violated her rights to freedom of speech, freedom of association, and due process. She also asserted various pendent state claims. As previously noted, the district court dismissed the action pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The district court held that under Connick v. Myers, supra, Sanguigni's statements were not a matter of public concern and were therefore not protected by the First Amendment. The could also held that there had been no violation of Sanguigni's due process rights because she had no property right in her coaching position. Sanguigni appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 II.
 
 11
 A. We turn first to Sanguigni's claim that the defendants violated her right to freedom of speech by penalizing her for statements made in the newsletter. Of course, the day has long since passed when individuals surrendered their right to freedom of speech by accepting public employment. See Connick, 461 U.S. at 143-44, 103 S.Ct. at 1688-89; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Today, public employees enjoy substantial free speech rights, as the Supreme Court's decision in Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), strikingly illustrates. There, the Court held that the First Amendment prohibited the firing of an employee of a county constable's office for saying to a co-worker during a private conversation in the workplace that if another attempt was made to assassinate President Reagan, "I hope they get him."
 
 
 12
 While holding that public employees enjoy substantial free speech rights, the Supreme Court has nevertheless recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734. The Court has therefore held that, in determining a public employee's right to free speech, it is necessary "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.
 
 
 13
 With respect to personnel actions, the Court has held that First Amendment rights are implicated only when a public employee's speech relates to matters of public concern. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Connick v. Myers, 461 U.S. at 146, 103 S.Ct. at 1690. This rule reflects the fact that speech on matters of public concern is "at the heart of the First Amendment's protection." First National Bank of Boston v. Bellotti, 435 U.S. 765, 776, 98 S.Ct. 1407, 1415, 55 L.Ed.2d 707 (1978). See also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759, 105 S.Ct. 2939, 2945, 86 L.Ed.2d 593 (1985) (plurality). As the Court explained in Connick, 461 U.S. at 145, 103 S.Ct. at 1689 (citations omitted):
 
 
 14
 The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." ... "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." ... Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the " 'highest rung of the hierarchy of First Amendment values,' " and is entitled to special protection.
 
 
 15
 "In contrast, speech on matters of purely private concern is of less First Amendment concern." Dun & Bradstreet, Inc., 472 U.S. at 759, 105 S.Ct. at 2945 (plurality opinion). See also Connick, 461 U.S. at 146-47, 103 S.Ct. at 1689-90. Accordingly, we must determine whether Sanguigni's statements in this case related to a matter of public concern.
 
 
 16
 B. The Supreme Court and this court have decided numerous cases that elucidate the meaning of speech by public employees that relates to matters of public concern. We will not attempt to distill from these decisions a precise definition of a matter of "public concern." Nor will we attempt to provide an exhaustive catalog of the types of statements that may fall within that rubric. We believe, however, that the cases thus far decided by the Supreme Court and by this court may be categorized as follows.
 
 
 17
 Several cases hold that speech related to broad social or policy issues is of public concern. For example, in Rankin, 483 U.S. at 386-87, 107 S.Ct. at 2897-98, the Supreme Court seemingly reasoned that the employee's remark regarding the desirability of assassinating President Reagan constituted a comment, albeit an "inappropriate" or "controversial" one, as the Court put it, on "the policies of the President's administration." In addition, decisions have held that complaints about racial discrimination constituted matters of public concern. Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir.1988).[2] See Connick, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8.
 
 
 18
 Several cases finding statements to be of public concern involved speech that not only touched on broad social issues but also implicated the discharge of public responsibilities by an important government office, agency, or institution. In Connick, in which a disgruntled assistant district attorney circulated a questionnaire to her colleagues, the Court held that one question in the circular--whether assistant district attorneys felt pressed to work on certain political campaigns--related to a matter of public concern. The Court observed (461 U.S. at 149, 103 S.Ct. at 1691) that such pressure would be contrary to the Constitution and to a demonstrated public interest "that government service should depend upon meritorious performance rather than political service." Thus, the question at issue related to the broad issue of political patronage and had obvious implications with respect to the effective functioning of the district attorney's office. Other cases involving speech that shared such dual characteristics include Pickering v. Board of Education, supra (teacher sent letter to a newspaper criticizing school's allocation of funds between educational and athletic programs); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir.1989) (chief of police told local television station that township supervisors pressured police to "fix" citations); and Johnson v. Lincoln University, 776 F.2d 443 (3d Cir.1985) (professor at historically black university commented on alleged lowering of academic standards and the effect on blacks).[3]
 
 
 19
 Some decisions in which statements were found to be a public concern involved speech that related primarily to the way in which a government office was serving the public. For example, in Czurlanis v. Albanese, 721 F.2d 98 (3d Cir.1983), a county employee appeared at a meeting of the county's governing body, criticized the county and state governments for practices "that he considered inefficient, wasteful, and possibly fraudulent and, in some cases, made suggestions for correcting the problems." Holding that these statements related to matters of public concern, we wrote (id. at 104):
 
 
 20
 Unlike the plaintiff in Connick, Czurlanis spoke as a concerned citizen and taxpayer and not as an aggrieved employee. He protested the waste of taxpayer money and alleged serious deficiencies in record keeping.... Information concerning the functioning of a segment of the County government is of considerable public importance ...
 
 
 21
 We also noted that "he raised these matters before the ... body with legislative power and investigative power germane thereto." See also Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (college professor's legislative testimony and other statements critical of the Board of Regents may be constitutionally protected).
 
 
 22
 Finally, one of our decisions, Zamboni v. Stamler, 847 F.2d 73 (3d Cir.), cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988), the case that Sanguigni finds "most analogous" to her own,[4] involved speech that was of public concern because it formed part of official proceedings concerning important alleged improprieties by a government office. In that case, a detective in a county prosecutor's office criticized certain aspects of the operations of the office, particularly a reorganization plan that adversely affected him. He also wrote to the state civil service commission and sued in state court, contending that the reorganization plan violated state civil service laws. In holding that these criticisms were matters of public concern, we found it relevant that the detective had directed his comments "to the appropriate officials who were in a position to redress" the challenged actions[5] and that "[i]n all of these expressions [he] referred to the policy issue as well as to his personal complaint." 847 F.2d at 78.
 
 
 23
 While all the statements described above were found to involve matters of public concern, an opposite conclusion has been reached regarding speech related solely to mundane employment grievances. Thus, in Connick, all of the questions on the questionnaire except the one related to political campaigns--questions regarding office transfer policy, office morale, the need for a grievance committee, and the employees' level of confidence in supervisors--were found not to be of public concern. The Court elaborated (461 U.S. at 148, 103 S.Ct. at 1690-91):
 
 
 24
 Myers [the dissatisfied employee] did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors.
 
 
 25
 Somewhat similarly, in Gaj v. United States Postal Service, 800 F.2d 64, 67 (3d Cir.1986), we held that an employee's complaints about safety matters and working conditions did not relate to matters of public concern because the complaints were not made to protect the interests of other employees but only to protect the interests of the complaining employee himself.
 
 
 26
 C. In light of these precedents, we are convinced that Sanguigni's statements in the present case did not relate to a matter of public concern. Sanguigni did not comment on any broad social or policy issue. Nor did she comment on how the Taylor Allderdice School was discharging its educational responsibilities or how the school authorities were spending the taxpayers' money. And unlike the employee in Zamboni, her comments were not made as part of judicial or administrative proceedings; she did not raise any "policy issue"; and her newsletter did not allege any violations of laws. Rather, her statements focused solely on employee morale, and we see no meaningful distinction between these statements and those found unprotected in Connick. In Connick, 461 U.S. at 148, 103 S.Ct. at 1690, as we have noted, the Supreme Court observed that "the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." Here likewise, the newsletter, if circulated to the public, would convey little, if any, information other than that some faculty members were "being put under undue stress," had experienced "bad luck," and had left the building with "low esteem."
 
 
 27
 We also find the "context" of Sanguigni's statements to be significant. See Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690-91. As previously noted, Sanguigni's comments appeared in a faculty newsletter otherwise devoted exclusively to topics such as extra effort buttons, the "April showers bingo," the faculty lunch menu, the employee-of-the-month award, and the work of the Sunshine Committee.[6]
 
 
 28
 In sum, we hold that Sanguigni's statements did not relate to matters of public concern. Accordingly, the district court properly dismissed her free speech claim.
 
 III.
 
 29
 Sanguigni argues that the defendants also violated her right to freedom of association, since statements in the newsletter were intended to organize faculty opposition to the school administration.
 
 
 30
 Sanguigni's free association claim touches on an issue on which the circuits are in disagreement. The Sixth and Seventh Circuits have held that the analysis set forth in Connick applies to both freedom of speech and freedom of association claims. See Griffin v. Thomas, 929 F.2d 1210, 1212-1214 (7th Cir.1991); Boals v. Gray, 775 F.2d 686, 691-693 (6th Cir.1985). These courts have noted that "although Connick did not specifically refer to associational rights in drawing the distinction between speech on matters of public concern and matters of private concern, Connick acknowledged that the governing precedent, Pickering, was rooted in cases dealing with speech and associational rights." Griffin, 929 F.2d at 1213; Boals, 775 F.2d at 692. See Connick v. Myers, 461 U.S. 138, 144-145, 103 S.Ct. 1684, 1688-89, 75 L.Ed.2d 708 (1983). The Seventh Circuit has also noted that although the First Amendment separately guarantees the right to freedom of speech and to petition the government, these rights "are related and usually subject to the same constitutional analysis." Wayte v. United States, 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 1532 n. 11, 84 L.Ed.2d 547 (1985). See also McDonald v. Smith, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). By contrast, the Eleventh Circuit has held that Connick does not apply to First Amendment associational claims, stating that such a restriction would overturn established precedent and "exact a substantial toll upon first amendment liberties." Hatcher v. Board of Public Education & Orphanage, 809 F.2d 1546, 1558 (11th Cir.1987).
 
 
 31
 Sanguigni relies on our decision in Labov v. Lalley, 809 F.2d 220 (3d Cir.1987). In that case, a deputy sheriff alleged that various personnel actions were taken against him after he attempted to organize a collective bargaining unit and after he gave testimony before a grand jury investigating possible criminal conduct by a former sheriff. This court held that the deputy sheriff had stated a claim under Section 1983, explaining only that "efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." Labov, 809 F.2d at 222. The court never mentioned Connick either with respect to the associational claim or the free speech claim and, in fact, did not address the free speech claim at all. Because the Labov decision does not make clear whether the court found that Connick does not apply in associational cases or that Connick applies but that the speech at issue was a matter of public concern, we do not believe that the Labov decision is controlling here.
 
 
 32
 In any event, we do not find it necessary to confront the issue whether Connick generally applies to claims involving the freedom of association. We hold only that Connick governs Sanguigni's freedom of association claim because that claim is based on speech that does not implicate associational rights to any significantly greater degree than the employee speech at issue in Connick. The employee in Connick circulated a questionnaire to her colleagues in an apparent effort to elicit their support for her position with respect to the office's transfer policy, its handling of grievances, and other matters. See 461 U.S. at 141, 103 S.Ct. at 1686. Here, Sanguigni asserts that her statements in the newsletter were intended to gather opposition to the school administration. Because we believe that both cases implicate associational rights in essentially the same way and to the same degree, we apply the Connick analysis to Sanguigni's freedom of association claim. We therefore affirm the district court's dismissal of that claim on the ground that it did not involve a matter of public concern.IV.
 
 
 33
 Finally, Sanguigni argues that the defendants violated her Fourteenth Amendment rights by removing her from her coaching positions without procedural due process. The district court dismissed this claim on the ground that Sanguigni had no property interest in the coaching positions. We agree with the result reached by the district court.
 
 
 34
 As the Supreme Court has noted (Board of Regents v. Roth, 408 U.S. 564, 569-570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972)):
 
 
 35
 The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite.
 
 
 36
 A property interest in state employment exists where an employee has a legitimate claim of entitlement to such employment under state law, policy, or custom. An employee, however, must have more than an abstract type of unilateral expectation. Id. at 577-578, 92 S.Ct. at 2709-10; Unger v. National Residents Matching Program, 928 F.2d 1392, 1397 (3d Cir.1991); Bradley v. Pittsburgh Board of Education, 913 F.2d 1064, 1078 (3d Cir.1990); Stana v. School Dist. of the City of Pittsburgh, 775 F.2d 122, 126 (3d Cir.1985).
 
 
 37
 In her complaint, Sanguigni alleged only that "[s]he had a property or liberty interest in [the coaching] job arising under the Collective Bargaining Agreement and (sic) the Federation of Teachers and the Pittsburgh Board of Public Education and the past practices of the School District." App. at 16a. We do not believe this allegation states a legitimate claim of entitlement to continued employment as a coach. In Unger v. National Residents Matching Program, 928 F.2d 1392, 1399 (3d Cir.1991), we noted that only two types of contracts have been found to be property protected by the Fourteenth Amendment. The first is a contract that confers a protected status, such as a tenure contract providing for permanent employment. The second is a contract explicitly providing that it may be terminated only for cause. Sanguigni's collective bargaining agreement does not fall into either of these categories. She has not alleged that under the agreement she had tenure as a coach or that the contract provided for dismissals from such a position only for cause.
 
 
 38
 In addition to relying on the collective bargaining agreement, Sanguigni alleged that she had a property interest in the coaching positions as a result of "the past practices of the School District." However, this conclusory allegation without more is plainly insufficient to satisfy our requirement that claims of this nature be pled with some specificity. See Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir.1988), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). We therefore affirm the district court's dismissal of Sanguigni's due process claim. See also Lagos v. Modesto City Schools Dist., 843 F.2d 347 (9th Cir.), cert. denied, 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988).
 
 V.
 
 39
 For the reasons stated above, we affirm the judgment of the district court.
 
 
 
 [1]
 Since this is an appeal from a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, our scope of review is plenary, and we must accept as true all facts alleged in the complaint and all reasonable inferences that can be drawn from them. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir.1990)
 
 
 [2]
 In Rode, we found the allegations in that case--concerning discrimination by the Pennsylvania State Police--to be of particular public importance because "of the prior protracted history of litigation against [the state police] charging it with racial animus in its employment practices ... [and] the hearings conducted by the state legislature to determine the extent of racial discrimination in the [state police]...." Rode, 845 F.2d at 1201-1202
 
 
 [3]
 In Mt. Healthy City Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a teacher telephoned a radio station and revealed the substance of a memorandum written by the principal to various teachers relating to teacher dress and appearance. This memorandum was "apparently prompted by the view of some in the administration that there was relationship between teacher appearance and public support for bond issues" (Id. at 282, 97 S.Ct. at 573). The Court held that the teacher's speech was constitutionally protected. Because the Court provided little explanation for this holding, the Court's precise reason for viewing this speech as a matter of public concern is not clear. The speech may, however, be viewed either as related to a social or political issue (teacher dress codes or efforts to influence voters) or to the effectiveness of the school. See also footnote 2, supra (discussing Rode v. Dellarciprete, supra)
 
 
 [4]
 Appellant's Brief at 10
 
 
 [5]
 We see no inconsistency between our reliance in Czurlanis and Zamboni on the official context in which the statements were made and the Supreme Court's holdings in Rankin, 483 U.S. at 386 n. 11, 107 S.Ct. at 2898 n. 11, and Givhan, 439 U.S. 410, 99 S.Ct. 693, that private remarks may relate to matters of public concern. The fact that speech was addressed to public officials may indicate that the speech dealt with a matter of public concern. However, the fact that speech clearly dealing with a matter of public concern was not addressed to the public does not vitiate its protected status
 
 
 [6]
 It is conceivable that a statement on a matter of great public concern might appear in such a publication but the context in which a statement appears is nevertheless relevant in assessing its character