UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2134

PATRICK J. O'CONNOR,

Plaintiff, Appellant,

v.

ROBERT W. STEEVES, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Selya, Circuit Judge,

Aldrich, Senior Circuit Judge,

and Cyr, Circuit Judge.

Paul F. Denver with whom Neil Rossman and Rossman, Rossman &

Eschelbacher were on brief for appellant.

John Foskett with whom Deutsch, Williams, Brooks, DeRensis,

Holland & Drachman, P.C., Nancy Merrick, Merrick & Louison, Charles H.

Riley, Jr. and Ganz, Ham & Riley were on brief for appellees.

May 28, 1993

CYR, Circuit Judge. Patrick O'Connor, former Superin-
CYR, Circuit Judge.

tendent of Public Works for the Town of Nahant, Massachusetts

("Town"), was discharged following an extended feud with Select-

man Robert Steeves. O'Connor sued the Town and its three select-

men Steeves, Harry Edwards and Richard Lombard for violat-

ing his First Amendment rights to freedom of speech and political

association. The district court granted summary judgment for all

defendants.

I

BACKGROUND

Summary judgment is appropriate if no genuine issue of

material fact exists and the moving party is entitled to judgment

as a matter of law, Fed. R. Civ. P. 56(c); Mesnick v. General

Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. denied, 112

S.Ct. 2965 (1992). All reasonable inferences are to be drawn in

favor of the party opposing summary judgment, in this case

appellant O'Connor, just as all disputed facts are viewed in the

light most favorable to him. See Goldman v. First Nat'l Bank,

985 F.2d 1113, 1116 (1st Cir. 1993); Garside v. Osco Drug, Inc.,

895 F.2d 46, 48 (1st Cir. 1990). On the other hand, we will not

credit "conclusory allegations, improbable inferences, and unsup-

ported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co.,

896 F.2d 5, 8 (1st Cir. 1990).

2

A. The Town

Nahant, Massachusetts, is a municipality of approxi-

mately 4,200 people, located north of Boston. Under the Town

Charter, a three-member Board of Selectmen serves as the "chief

policymaking agency of the town." Selectmen serve staggered

three-year terms; one seat on the Board is filled by election

each year.

Among their other duties, the Selectmen are charged

with appointing a Superintendent of Public Works (hereinafter

"Superintendent"), whose duties are defined in the Town Charter:

He shall administer, under the supervision
and direction of the Selectmen, a Department
of Public Works and the highway, water, sew-
er, cemetery, tree warden and health
departments. He shall also administer, under
the supervision and direction of the Select-
men, such other departments under their su-
pervision as the Selectmen may designate,
except the fire and police. He shall be
responsible for the administration of all
departments within the scope of his duty, and
shall hold office subject to the will of the
Selectmen. He shall be specially fitted by
education, training and experience to perform
the duties of said office. . . . During his
tenure, he shall hold no other elective or
appointive office, nor shall be engaged in
any other business or occupation. . . . and
shall, subject to the approval of the Select-
men, appoint such assistants, agents and
employees as the performance of the duties of
the various departments under his supervision
may require.

The job description for the position notes that it is "performed

with professional independence and considerable latitude for

independent administrative judgment" and that "[e]rrors could

result in major loss of time and expenses." It also notes that

3

the Superintendent "makes frequent contacts with other officials

and the general public." Commensurate with these responsibili-

ties, the Superintendent receives a salary of $41,286; by

comparison, the Nahant Police Chief and Nahant Fire Chief each

receive $41,365, and the Nahant Superintendent of Schools re-

ceives $48,000. Lower level salaries in the Department of Public

Works ["Department"] range from $20,000-$24,000 for laborers to

$31,000-35,000 for foremen.

B. O'Connor's Appointment

Prior to 1989, Robert Steeves served as Superintendent.

The Town's three Selectmen at the time were Jayne Solomine,

Richard Lombard, and Charles Kelley. In February 1989, following

Kelley's death, Steeves was elected to the Board of Selectmen,

triggering a search for a replacement Superintendent. The

position was advertised as requiring "an associates degree in

civil engineering or five years experience in related engineering

fields."

Although O'Connor had no engineering degree, he submit-

ted an application for the position. O'Connor had worked in

construction prior to 1963; then as a foreman in a local manufac-

turing plant; then, following his retirement, in various posi-

tions for the Rynn Corporation, a family-owned construction

company. More to the present point, perhaps, O'Connor had been

active in the Solomine, Kelley, and Lombard election campaigns,

having headed Solomine's initial campaign for public office in

1983. On July 20, 1989, O'Connor was appointed Superintendent,

4

by a 2-1 vote, with Lombard and Solomine voting in favor.

Steeves voted against the appointment, stating that O'Connor was

unqualified and had been appointed because of his connections to

the Lombard and Solomine election campaigns.

C. Steeves and O'Connor

Notwithstanding O'Connor's appointment as Superinten-

dent, Steeves continued his hands-on involvement in the Depart-

ment, dealing with vendors, directing personnel, and making

various small purchases on the Department's account. O'Connor

believed that Steeves' continuing involvement "undermined"

O'Connor's authority within the Department, and on several occa-

sions in late 1989 O'Connor told Steeves he should stay "out of

doing my job." At around the same time, O'Connor became aware of

Steeves' practice of purchasing goods for personal use through

the Department account, which was not subject to the 5% Massachu-

setts sales tax. Although Steeves later repaid the Department

for these purchases, the record does not indicate that the sales

tax was ever paid. After discussing the matter with Town Accoun-

tant Joseph Canty, O'Connor concluded that the practice was

improper, and asked Steeves to stop "so we could have some

accountability through the financial system and all these invoic-

es and everything else." Steeves did not respond.

When his approaches to Steeves proved unsuccessful,

O'Connor complained to Selectmen Lombard and Solomine about

Steeves' conduct, including the improper use of the Department

account. In January or February 1990, O'Connor wrote the Board,

5

detailing his complaints about Steeves' purchasing practices.

The letter was discussed at a "public meeting" of some kind,

although O'Connor is not sure whether any members of the public

were in attendance. Selectman Lombard told Steeves to stop using

the Department account, and wrote all department heads directing

them to instruct employees not to charge purchases on department

accounts without authorization. In response to Lombard's letter,

O'Connor drafted an internal memorandum prohibiting unauthorized

purchases on the Department account. The memorandum had little

noticeable effect. Steeves continued to charge personal pur-

chases on the Department account.

In March 1990, O'Connor addressed another memorandum to

the Board, again describing Steeves' personal use of the Depart-

ment account, and requesting that these practices be stopped.

Lombard read the memorandum at another Board meeting and issued

Steeves another warning, but apparently Steeves did not terminate

the practice. The various disputes between O'Connor and Steeves

led to increased friction within the Department. By the spring

of 1990, as all parties concede, the Department's employees had

divided into two factions, which communicated poorly, apparently

on unfriendly terms.

2. The Town Water Crisis

In late March 1990, shortly before the annual Town

election, larger events temporarily distracted the parties from

the dispute over Steeves' purchasing practices, and caused them

to focus instead on the breakdown of communications within the

6

Department. Three consecutive readings of the Town water supply

revealed bacterial contamination; under Massachusetts law, the

Department was required to notify the public and the Massachu-

setts Department of Environmental Protection ("DEP"), and to take

steps to safeguard the Town water supply. O'Connor was notified

of the contamination during a family emergency, and called on

Steeves to take charge of notifying the DEP. Steeves later

insisted that he promised O'Connor no specific assistance.

Phillip Applin, a Department employee, testified that although he

provided information to Steeves at O'Connor's direction, he did

so with hesitation, "because Mr. Steeves was not supposed to be

involved with bothering the Public Works employees." Applin also

testified that, as late as April 6, 1990, O'Connor and Steeves

obviously had not yet spoken to each other about whether the DEP

had been notified. Apparently as a result of the breakdown in

communications between the parties, neither DEP nor the Town was

notified about the contamination for several days, and a number

of Town residents became seriously ill.

The perceived mishandling of the water contamination

problem generated considerable public controversy, and became an

important factor in the April, 1990 elections. Selectman Jayne

Solomine, who supported O'Connor, was replaced by Harry Edwards,

a Steeves supporter. Edwards later stated that he had been ap-

proached, prior to the election, by voters concerned about

O'Connor's performance during the Town water crisis, and that he

viewed his election as a mandate to remove O'Connor as Super-

7

intendent.

D. O'Connor's Termination

Following Edwards' election and the correction of the

water contamination problem, O'Connor resumed his complaints

about Steeves' unauthorized purchasing practices. In May or

June, O'Connor presented the Board with another invoice for a

personal purchase by Steeves on the Department account. O'Connor

also approached Edwards, the new Selectman, seeking to discuss

Steeves' misuse of Department accounts. Edwards appeared unin-

terested.

At a Board meeting on May 24, 1990, Lombard moved to

reappoint O'Connor as Superintendent; Edwards and Steeves blocked

the motion. On June 28, 1990, Lombard again moved to reappoint

O'Connor, but once again Edwards and Steeves blocked the reap-

pointment. Edwards then moved to terminate O'Connor, but with-

drew the motion without explanation. On July 12, 1990, O'Con-

nor's termination again came up for a Board vote. Just before

the vote, O'Connor left the meeting, went to his office, and

returned with a number of Department invoices signed by Steeves,

then proceeded to describe Steeves' improper conduct to those in

attendance, stating that he wanted the townspeople to know "what

was really going on in the city hall."1

1O'Connor apparently succeeded in piquing public interest
about Steeves' purchasing practices. Following O'Connor's
termination, the Essex County District Attorney requested "an
audit of the Town's procurement policies, practices and proce-
dures." The State Auditor ultimately identified 32 purchases of
goods totalling approximately $2600 by individuals for

8

Lombard voted against O'Connor's termination; Edwards

and Steeves voted in favor. Edwards later said he voted to ter-

minate O'Connor because of the "mandate" he had been given by

voters after the Town water crisis. Steeves later stated that he

voted to terminate O'Connor because of O'Connor's alleged in-

volvement in Solomine's unsuccessful reelection bid, and because

O'Connor allegedly had told a Department employee not to vote for

Edwards during the April 1990 elections, which O'Connor denies.

In August, 1990, O'Connor sued, alleging, inter alia, that he had

been discharged in retaliation for his political affiliation with

Solomine, and for his accusations against Steeves.2

II

DISCUSSION

A. Political Discharge

A public employee may not be discharged, demoted, or

disciplined for political activities or beliefs, unless political

affiliation or belief is an appropriate job qualification for the

particular position. See Rutan v. Republican Party of Illinois,

497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1980); Elrod

their own use. The audit noted that "the practice of allowing
individuals to purchase items through the town is improper, if
not illegal, and holds the town at risk of paying for any pur-
chases that are not identified as personal purchases." The audit
did not identify the individuals responsible for these improper
purchases.

2The district court dismissed O'Connor's various other
claims under federal and state law on the merits. O'Connor does
not challenge those dismissals.

9

v. Burns, 427 U.S. 347 (1976). Assuming, without deciding, that

political affiliation was a "motivating factor" for O'Connor's

discharge, see Mt. Healthy City School Dist. Bd. of Education v.

Doyle, 429 U.S. 274, 287 (1977); see also Acosta-Sepulveda v.

Hernandez-Purcell, 889 F.2d 9, 12-13 (1st Cir. 1989); Rosado v.

Zayas, 813 F.2d 1263 (1st Cir. 1987), we affirm the grant of

summary judgment against O'Connor, since we conclude that politi-

cal affiliation was an appropriate requirement for the Superin-

tendent position.

Although "[t]he difficulties in determining whether a

government employee is protected from a politically motivated

discharge are considerable," Agosto-de-Feliciano v. Aponte-Roque,

889 F.2d 1209, 1214 (1st Cir. 1989) (en banc), the test we apply

is familiar. First, we inquire whether the overall functions of

the employee's department or agency involve "decision making on

issues where there is room for political disagreement on goals or

their implementation," Jimenez Fuentes v. Torres Gaztambide, 807

F.2d 236, 241-42 (1st Cir. 1986) (en banc), cert. denied, 481

U.S. 1014 (1987); see also Rodriguez-Burgos v. Electric Energy

Auth., 853 F.2d 31, 35 (1st Cir. 1988); Goyco de Maldonado v.

Rivera, 849 F.2d 683, 684-85 (1st Cir. 1988). Second, we decide

whether the particular responsibilities of the plaintiff's

position, within the department or agency, resemble those of "a

policymaker, privy to confidential information, a communicator,

or some other office holder whose function is such that party

affiliation is an equally appropriate requirement" for continued

10

tenure. Jimenez Fuentes, 807 F.2d at 242. Among the indicia

material to the second element are "'relative pay, technical

competence, power to control others, authority to speak in the

name of policymakers, public perception, influence on programs,

contact with elected officials, and responsiveness to partisan

politics and political leaders.'" Id. (quoting Ecker v. Cohalan,

542 F.Supp. 896, 901 (E.D.N.Y. 1982)); see also Mendez-Palou v.

Rohena-Betancourt, 813 F.2d 1255, 1258-59 (1st Cir. 1987); see

generally Stott v. Martin, 783 F.Supp. 970, 976-82 (E.D.N.C.

1992) (collecting First Circuit case law following Jimenez Fu-

entes).

The summary judgment record establishes beyond perad-

venture that the Department "handled matters potentially subject

to partisan political differences," Mendez-Palou, 813 F.2d at

1258, not unlike governmental departments in larger municipali-

ties. See Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th

Cir. 1985), cert. denied, 474 U.S. 946 (1985) (cautioning against

"unduly myopic view" of "the role of politics in the seemingly

apolitical context of universal provision of services").

The primary function of any local government
entity is the provision of services such as
police and fire protection, public schools,
hospitals, transportation, and libraries, as
well as quasi-utility functions such as wa-
ter, garbage, and sewage services. Elections
often turn on the success or failure of the
incumbent to provide these services, and, as
campaigns develop, the opposing sides put
forth varying proposals about how best to
provide services. While the ultimate goal of
all sides might be the same, there is clearly
room for principled disagreement in the de-
velopment and implementation of plans to

11

achieve that goal.

Id. Here, the Department's role in the life of the Town plainly

parallels the Water Department's role in Tomczak, which repeated-

ly has been cited in this circuit as a benchmark for evaluating

the political responsibilities of public employment. See, e.g.,

Collazo Rivera v. Torres Gaztambide, 812 F.2d 258, 260 (1st Cir.

1987) (finding administration of agrarian reform programs, by

Puerto Rico's Regional Housing Administration, "at least as

important to partisan political goals as the provision of water

discussed in Tomczak"); see also Cordero v. De Jesus-Mendez, 867

F.2d 1, 15 (1st Cir. 1989) (finding "no evidence of comparable

responsibility" between Water Director's position in Tomczak and

plaintiff's position as Administrative Aide to the Assistant

Director of Public Works in Town of Moca, Puerto Rico); Roman

Melendez v. Inclan, 826 F.2d 130, 133 (1st Cir. 1987) (finding

duties of Regional Manager in Puerto Rico's General Services

Administration "analogous, in general character," to that of

Water Director in Tomczak).3 It also offers clear confirmation

3Like the Water Department in Tomczak, the Department

performed "quasi-utility functions" for virtually all community
residents, and, therefore, was capable of attracting significant
public attention in the context of a local election campaign.
The same can be said, of course, about many other public and
municipal agencies and departments. Thus, for example, we have
held this first prong of the Jimenez Fuentes test to have been

met by the position of Regional Director of the Puerto Rico
General Services Administration, insofar as that agency was
responsible for determining "the degree of attention [to be
given] the physical conditions of public buildings . . . which
buildings need immediate or special care, . . . whether to give
priorities to rural or urban schools," Roman Melendez, 826 F.2d

at 134; the Puerto Rico Department of Natural Resources, which
"formulates and implements public policies that potentially

12

of Tomczak's continuing validity: by all accounts, as the

district court pointed out, the 1990 elections for Town Selectman

turned in large part on the Department's failure to assure safe

drinking water to Town residents.

Moreover, whatever difficulties we might face in

applying the second prong of the Jimenez Fuentes test to subor-

dinate positions within the Department, see, e.g., Cordero, 867

F.2d at 14-15 (finding political affiliation inappropriate job

requirement for assistant director of public works), the Superin-

tendent's "inherent responsibilities" under the Town Charter, as

the person "responsible for the administration of all departments

within the scope of his duty," plainly "'had a bearing on the

implicate partisan interests," Monge-Vazquez v. Rohena-Betan-

court, 813 F.2d 22, 26 (1st Cir. 1987); accord Navas Chabran v.

Santiago Nieves, 666 F.Supp. 16, 18 (D.P.R. 1987); and the Puerto

Rico Urban Development and Housing Corporation, which partici-
pates in "the provision of housing to low and middle income city
residents . . . a vital political issue," Jimenez Fuentes, 807

F.2d at 241-44.
O'Connor challenges any analogy to Tomczak, asserting that

"the duties, size of staff and budget of the First Deputy Commis-
sioner of the Water Department of Chicago . . . differ material-
ly" from those of the Nahant Superintendent. It is true, of
course, that the $4O million operating budget and 1,150 employees
controlled by the Water Department in Tomczak greatly exceed

O'Connor's $60,000 departmental budget and fifteen person staff.
But we think O'Connor's direct comparison, based exclusively on
departmental size and budget, overlooks the equally dramatic
differences in the populations and municipal budgets of Chicago
and Nahant. Chicago's population is approximately 2.8 million;
Nahant's approximately 4,200. Chicago's annual budget is approx-
imately $3.2 billion; Nahant's approximately $4 million. We do
not think governmental provision of essential public services is
any the less prone to politicization in smaller communities;
municipal services are as essential to the few as to the many.
In light of the broader scope of the public services it provides,
we think the role of the Department in the political life of
Nahant is at least comparable to that of the Water Department in

Chicago. Cf. Cordero, 867 F.2d at 15.

13

partisan goals and policies'" of the Department as a whole.

Rodriguez-Burgos, 853 F.2d at 35 (quoting Mendez-Palou, 813 F.2d

at 1263). O'Connor protests that, in practice, his position

involved little managerial responsibility, and he was in fact

"essentially a working foreman." As we have held, however, "the

actual past duties of the discharged employee are irrelevant if

the position inherently encompasses more expansive powers and

more important functions that would tend to make political af-

filiation an appropriate requirement for effective performance."

Mendez-Palou, 813 F.2d at 1258 (emphasis added). Accordingly,

absent ambiguity in the official job description, the analysis

must focus upon the "powers inherent in a given office, as

opposed to the functions performed by a particular occupant of

that office." Jimenez Fuentes, 807 F.2d at 242; see also, e.g.,

Batistini v. Aquino, 890 F.2d 535 (1st Cir. 1989); Mendez-Palou,

813 F.2d at 1258; cf. Stott, 783 F.Supp. at 976 n.6 (noting that

the Jimenez Fuentes court "did review plaintiffs' testimony about

their actual duties," and concluding that "such testimony may be

useful in filling gaps left by the official job description and

in amplifying the responsibilities listed in the description

. . . [though not] to belittle the job into one with less signif-

icant responsibilities").

The district court carefully, and in great detail,

analyzed the job description for the position of Superintendent,

and its unchallenged findings that seventeen of twenty-three

listed duties are "policymaking," "representative," or "per-

14

sonnel" functions comport with our "common sense judgment" on

the matter. See Jimenez Fuentes, 807 F.2d at 242. As the

district court correctly determined that O'Connor's political

affiliation was an appropriate criterion for the position that he

held, we affirm its grant of summary judgment on the political

discharge claim.

B. "Whistleblowing" Claim

O'Connor's alternative claim presents a closer ques-

tion. Essentially, O'Connor contends that he was discharged

because he disclosed Steeves' unauthorized use of the Department

account; that these disclosures dealt with a matter of signifi-

cant public concern; and that his First Amendment right to speak

out on the subject against the interests of Steeves, his

elected superior outweighed the Town's demonstrated interest

in protecting Department operations from any resulting disrup-

tions and inefficiencies. We agree, and since we are unable to

conclude, on the present record, that O'Connor's discharge could

not have resulted from his protected speech (as opposed to his

unprotected speech, or his job performance as Superintendent), we

must vacate the grant of summary judgment for the Town and remand

to the district court for further proceedings.

1. Legal Standard and Standard of Review

A government employee retains the First Amendment right

to speak out, as a citizen, on matters of public concern, so long

as the employee's speech does not unduly impede the government's

15

interest, as employer, in the efficient performance of the public

service it delivers through its employees. Pickering v. Board of

Educ., 391 U.S. 563, 568 (1968); see also Rankin v. McPherson,

483 U.S. 378 (1987); Connick v. Myers, 461 U.S. 138 (1983);

Brasslett v. Cota, 761 F.2d 827 (1st Cir. 1985). Three tests

determine whether the court is presented with an actionable claim

for the infringement of a public employee's First Amendment

rights.

First, the court must determine, on the basis of "the

content, form, and context of a given statement, as revealed by

the whole record," whether the employee was speaking "as a

citizen upon matters of public concern," or, alternatively, "as

an employee upon matters only of personal interest." Connick,

461 U.S. at 147-48. If an employee's speech "cannot be fairly

characterized as constituting speech on a matter of public

concern," then its First Amendment value is low and "a federal

court is not the appropriate forum in which to review the wisdom

of a personnel decision" arising therefrom. Id. at 146-47.

Second, if the employee did speak out on a matter of

public concern, the court must balance the strength of the

employee's First Amendment interest, and any parallel public

interest in the information which the employee sought to impart,

against the strength of the countervailing governmental interest

in promoting efficient performance of the public service the

government agency or entity must provide through its employees.

Pickering, 391 U.S. at 568; Brasslett, 761 F.2d at 839. Though

16

often imprecise,

[t]his balancing is necessary in order to
accommodate the dual role of the public
employer as a provider of public services and
as a government entity operating under the
constraints of the First Amendment. On the
one hand, public employers are employers,

concerned with the efficient function of
their operations; review of every personnel
decision made by a public employer could, in
the long run, hamper the performance of pub-
lic functions. On the other hand, "the
threat of dismissal from public employment is
. . . a potent means of inhibiting speech."
Vigilance is necessary to ensure that public
employers do not use authority over employees
to silence discourse, not because it hampers
public functions but simply because superiors
disagree with the content of employees'
speech.

Rankin, 483 U.S. at 384 (citations omitted; emphasis in origi-

nal). As the Connick and Pickering determinations depend on

whether the employee statements "are of a character which the

principles of the First Amendment . . . protect," Connick, 461

U.S. at 150 n.10, these determinations are always subject to de

novo review. Id.; see also Rankin, 483 U.S. at 385-86; Brass-

lett, 761 F.2d at 835; see generally Bose Corp. v. Consumers

Union of United States, Inc., 466 U.S. 485, 499 (1984) ("in cases

raising First Amendment issues we have repeatedly held that an

appellate court has an obligation to 'make an independent exami-

nation of the whole record' in order to make sure that 'the

judgment does not constitute a forbidden intrusion on the field

of free speech'") (citations omitted).

Third, and finally, if the court determines that the

public employee's First Amendment interests in speaking out

17

outweigh a legitimate governmental interest in curbing the

employee speech, the plaintiff-employee must show that the pro-

tected expression was a substantial or motivating factor in the

adverse employment decision; and, if the plaintiff meets this

test, the defendant governmental entity must be afforded an

opportunity to show "by a preponderance of the evidence that [it]

would have reached the same decision . . . even in the absence of

the protected conduct." Mt. Healthy, 429 U.S. at 287; see also

Duffy v. Sarault, 892 F.2d 139 (1st Cir. 1989). This third test

implicates questions of fact; "clear error" review is appropriate

where judgment was entered after a trial on the merits, see

Duffy, 892 F.2d at 144-45, whereas plenary review applies at the

summary judgment stage. See Mesnick, 950 F.2d at 822.

2. Threshold Inquiry: "Matters of Public Concern"

The courts of appeals have adopted various approaches

for determining whether a topic of employee speech is of "public

concern," under the "threshold inquiry" required by Connick, 461

U.S. at 146. See, e.g., D. Gordon Smith, Note, "Beyond Public

Concern: New Free Speech Standards for Public Employees," 57 U.

Chi. L. Rev. 249, 258-61 (1990) (surveying case law). Some

courts have adopted a content-based analysis, focusing exclusive-

ly on "'which information is needed or appropriate to enable the

members of society' to make informed decisions about the opera-

tion of their government," McKinley v. City of Eloy, 705 F.2d

1110, 1113-14 (9th Cir. 1983) (quoting Thornhill v. Alabama, 310

U.S. 88, 102 (1946)), in effect providing per se protection to

18

public-employee speech on certain topics of "inherent" public

interest, such as official malfeasance or abuse of office. See

Koch v. City of Hutchinson, 847 F.2d 1436, 1446 n.17 (10th Cir.)

(en banc), cert. denied, 488 U.S. 909 (1988). Other courts have

adopted an analysis which turns either entirely or in part on the

employee's subjective intent, i.e., on whether the employee's

speech "was calculated to disclose misconduct" or to inspire

public debate on some issue of significant public interest.

Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) (emphasis in

original); see also Callaway v. Hafeman, 832 F.2d 414, 417 (7th

Cir. 1987) ("while the content of [plaintiff's] communications

touched upon an issue of public concern generally. . . . such

speech stands unprotected from employer scrutiny when uttered in

the pursuit of purely private interests"); Terrell v. University

of Texas System Police, 792 F.2d 1360, 1362 (5th Cir. 1986),

cert. denied, 479 U.S. 1064 (1987) ("the mere fact that the topic

of the employee's speech was one in which the public might or

would have had a great interest is of little moment"); Linhart v.

Glatfelter, 771 F.2d 1004, 1010 (7th Cir. 1985) (Connick "re-

quires us to look at the point of the speech in question: was it

the employee's point to bring wrongdoing to light? Or to raise

other issues of public concern, because they are of public

concern? Or was the point to further some purely private inter-

est?").4

4We identify these approaches, somewhat inexactly, as the
"contextual" and "content-based" approaches to Connick's thresh-

old test for determining the level of First Amendment speech

19

As our own case law implicitly recognizes, the circum-

stances of a particular case may govern the appropriate approach

under Connick. Where a public employee speaks out on a topic

which is clearly a legitimate matter of inherent concern to the

electorate, the court may eschew further inquiry into the employ-

ee's motives as revealed by the "form and context" of the expres-

sion. See, e.g., Brasslett, 761 F.2d at 844 n.14 (according no

apparent consideration to public employee's personal motive,

where fire chief's public commentary on available fire protec-

tion, and on Town Council's actions in dealing with associated

problems, plainly qualified as matters of inherent "public

concern"). On the other hand, public-employee speech on a topic

which would not necessarily qualify, on the basis of its content

alone, as a matter of inherent public concern (e.g., internal

working conditions, affecting only the speaker and co-workers),

may require a more complete Connick analysis into the form and

context of the public-employee expression, "as revealed by the

whole record," Connick, 461 U.S. at 146, with a view to whether

protection. Under the "content-based" approach, the objective
content of an employee's statement is determinative, and the
"form and context" of the statement are examined only in close
cases, to determine whether the content of the statement is of

"public concern." Under the "contextual" approach, the three
factors are considered seriatim. A determination that the

content of the expression addresses a "matter of public concern,"

while often described as "the greatest single factor in the
Connick inquiry," Breuer v. Hart, 909 F.2d 1035, 1039 (7th Cir

1990) (quoting Belk v. Town of Minocqua, 858 F.2d 1258, 1264 (7th

Cir. 1988)), does not end the inquiry; in certain circumstances
the employee may still be disciplined if the "form and context"
of the speech indicate that the employee was driven by purely
personal concerns.

20

the community has in fact manifested a legitimate concern in the

internal workings of the particular agency or department of

government, and, if so, whether the "form" of the employee's

expression suggests a subjective intent to contribute to any such

public discourse. See, e.g., Alinovi v. Worcester School Commit-

tee, 777 F.2d 776, 787 (1st Cir. 1985), cert. denied, 479 U.S.

816 (1986) (letters of reprimand issued to teacher by school

administration did not implicate an issue of "public concern"

under Connick, despite tangential connection to an incident

implicating the teacher's Fourth Amendment rights; "when [the

teacher] posted the letters . . . she was not concerned with any

possible violation of her Fourth Amendment rights, but rather,

with [a] purely personal issue concerning the lack of action on

the part of the administration regarding her disciplinary prob-

lem") (emphasis added). Since "almost anything that occurs

within a public agency could be of concern to the public,"

Terrell, 792 F.2d at 1362 (emphasis in original), a full-fledged

"form and context" analysis is appropriate in these instances.

"To presume that all matters which transpire within a government

office are of public concern would mean that virtually every

remark and certainly every criticism directed at a public

official would plant the seed of a constitutional case". See

Connick, 461 U.S. at 149.5

5The circumstances presented in Connick itself required both

forms of analysis. There, an assistant district attorney,
opposing her transfer to another department, circulated a ques-
tionnaire "concerning office transfer policy, office morale, the
need for a grievance committee, the level of confidence in super-

21

In our own case, O'Connor's allegations were not

limited to internal personnel procedures, affecting only himself

and other Department employees. Rather, O'Connor's revelations

visors, and whether employees felt pressured to work in political
campaigns." 461 U.S. at 141. Analyzing the "content, form and
context" of the employee's statements, the Supreme Court noted
that the employee "did not seek to inform the public that the
District Attorney's office was not discharging its governmental
responsibilities . . . [or] seek to bring to light actual or
potential wrongdoing or breach of trust on the part of [public
officials]." Id. at 148. However, it held, that the content of

one question did touch upon a "matter of interest to the communi-

ty," i.e., whether assistant district attorneys were pressured to

work in political campaigns. The Court then proceeded to evalu-
ate that question separately, under the second "balancing" step
in the Pickering analysis. See id. at 149-154. The separate

treatment given the one item of "inherent public concern" on the
employee questionnaire is consistent with our exempting such
clear First Amendment speech from the full-scale threshold
inquiry into the employee's motives in speaking, undertaken in
Connick in relation to the other items on the questionnaire. See

Zamboni v. Stamler, 847 F.2d 73, 78 (3d Cir.) ("[w]ere motivation

rather than content dispositive [in Connick], the Court would

have had no reason to isolate the one question that was of public
concern"), cert. denied, 488 U.S. 899 (1988).

Rankin v. McPherson, supra, is the only other Supreme

Court case to consider, in depth, the application of Connick's

threshold test. Rankin concerned a law enforcement employee's

private comment to a co-worker, in the aftermath of the assas-
sination attempt against President Reagan: "if they go for him
again, I hope they get him." 483 U.S. at 381. The Court found
that the statement, in context, "plainly dealt with a matter of

public concern," insofar as it "came on the heels of a news
bulletin regarding what is certainly a matter of heightened
public attention: an attempt on the life of the President." Id.

at 386 (emphasis added). The Court paid little attention to the
"form and context" of McPherson's statement, insofar as those
factors bore on her motives for speaking; indeed, if the Court

had done so, it probably would have found that the statement
(which apparently occurred without premeditation, in a private
conversation between co-workers) was motivated by little or no
civic concern to inform the public on any relevant issue. Rankin

suggests that the courts are to proceed to the second-stage
Pickering inquiry whenever public-employee speech, objectively

viewed in the context of a broader public discourse, addresses
(with reasonable specificity) an issue or topic implicating

"core" First Amendment concerns.

22

directly implicated a topic of inherent concern to the community

official misconduct by an incumbent elected official. Given

their direct bearing on Steeves' fitness for elective office, we

think O'Connor's allegations of improper purchases clearly

constituted a matter of legitimate public concern, obviating the

need for a threshold analysis of his dominant motive for speaking

out on these issues.6 Accordingly, we reject the Town's conten-

tions, based on the "form and context" of O'Connor's speech, that

O'Connor's personal motives should result in the denial of First

Amendment protection at the threshold. Cf. Pickering, 391 U.S.

at 572 (recognizing that government employees "are, as a class,

the members of a community most likely to have informed and

6The district court noted that the summary judgment record
included only five Department invoices signed by Steeves during
the entire period in question, representing cumulative personal
purchases amounting to approximately $500, on which a total state
sales tax approximating $20-25 would have been due. Based on
these small sums, and the fact that Steeves repaid the monies
expended by the Department, the district court considered Steev-
es' alleged misconduct de minimis. Given their bearing on

Steeves' fitness for elective office, these improper purchases
clearly pertained to a matter of legitimate public interest to
the community. If their infrequency, modest amount, and repay-
ment tempered their seriousness as a reflection upon Steeves'
suitability for elective office, that was a matter for the Nahant
electorate. See, e.g., Patrick v. Miller, 953 F.2d 1240, 1247-48

(10th Cir. 1992) (perceived illegalities in City's budgeting
activities constituted topic of "inherent" public concern;
"'[s]peech which discloses any evidence of corruption, impropri-
ety or other malfeasance on the part of city officials, in terms
of content, clearly concerns matter of public import'") (quoting
Conaway v. Smith, 853 F.2d 789, 796) (10th Cir. 1988)); Breuer v.

Hart, 909 F.2d 1035, 1038 (7th Cir. 1990) (County Sheriff's

alleged conversion of County property was "plainly of public
concern in its substance"); Brawner v. City of Richardson, 855

F.2d 187, 191-92 (5th Cir. 1988) (Police Department's alleged
misconduct in covering up internal investigations was "a matter
of public interest and therefore deserves constitutional protec-
tion").

23

definite opinions" about allocation of funds).

3. The Pickering Scale

As the content of O'Connor's allegations was of inher-

ent "public concern" for First Amendment purposes, we proceed to

the second test. Under Pickering, we are required to balance the

significance of the interests served by the public-employee

speech including the employee's interests in communicating,

and the interests of the community in receiving, information "on

matters of public importance" against the governmental employ-

er's legitimate interests in preventing unnecessary disruptions

and inefficiencies in carrying out its public service mission.

391 U.S. at 568-575.

We note at the outset that O'Connor's motives for

speaking out are properly weighed in the balance under Pickering.

See, e.g., Versarge v. Township of Clinton, 984 F.2d 1359, 1366

(3d Cir. 1993) (according "little weight," under Pickering, to

plaintiff's "vengeful and obstructionist interests in speaking

out on issue of public concern"). Thus, insofar as self-interest

is found to have motivated public-employee speech, the employee's

expression is entitled to less weight in the Pickering balance

than speech on matters of public concern intended to serve the

public interest. Id. Furthermore, we agree with the district

court that O'Connor's motives, prominently including the evident

self-interest in preserving his position as Superintendent, were

less than altruistic.

Nevertheless, the legitimate interest of the Town's

24

electorate in the type of information disclosed by O'Connor

represents a public benefit entitled to great weight in the

Pickering balance. Id. (citing O'Donnell v. Yanchulis, 875 F.2d

1059, 1061 (3d Cir. 1989)) ("On plaintiff's side of the balance,

we must also consider the interests of the public in plaintiff's

speech"). O'Connor's disclosures concerned alleged abuse of

public office on the part of an elected official, a matter

traditionally occupying "the highest rung of the hierarchy of

First Amendment values." Connick, 461 U.S. at 145.7 The strong

public interest in such disclosures supplements O'Connor's rela-

tively slight personal interest in speaking out, heavily weight-

ing the Pickering scale in favor of First Amendment protection

against retaliation for O'Connor's speech.8

On the other side of the Pickering scale, the Town has

yet to demonstrate its legitimate interest, as employer, in

7See also, e.g., Vasbinder v. Ambach, 926 F.2d 1333, 1339

(2d Cir. 1991) (public employee's Pickering interest is particu-

larly great where speech involves charges of "fraudulent and
corrupt practices" or other "unlawful conduct" by elected offi-
cial); but cf. Breuer, 909 F.2d at 1041 (upholding dismissal of

deputy sheriff for "whistleblowing" on corruption by sheriff,
based on county's "particularly urgent need for close teamwork
among those involved in the 'high stakes' field of law enforce-
ment") (citation omitted).

8It is also relevant that O'Connor's factual allegations
about Steeves' purchasing practices are essentially undisputed by
the defendants. We are not faced with a case in which a public
employee has intentionally disseminated false information. Both
sides of the Pickering balance might be significantly affected in

such circumstances. See Brasslett, 761 F.2d at 839 ("an employer

has a greater interest in curtailing erroneous statements than
correct ones, and still a greater interest in curtailing deliber-
ate falsehoods . . . . Correspondingly, an employee's interest
in making public statements is heightened according to their
veracity.").

25

curtailing the specific disclosures which O'Connor alleges were

the basis for his termination. Although the Town has shown con-

siderable disruption in the Department operations, and serious

deterioration in the working relations between O'Connor and

Steeves, and their respective factions, it has not yet met its

burden of showing that the disruption was attributable to the

exercise of O'Connor's First Amendment right to speak out on this

subject, so as to warrant discharging him on speech-related

grounds. On the contrary, the disruption which occurred in

Department operations may as readily be attributed to unrelated

factors: for example, to Steeves' allegedly unauthorized inter-

ference in the Department operations. See, e.g., Zamboni, 847

F.2d at 79 ("in evaluating the disruption, if any, that resulted

from [plaintiff's] criticisms . . . the district court must

consider whether any unrest was caused directly by [the plain-

tiff's] speech or whether it was exacerbated by defendants'

actions"). Notwithstanding O'Connor's status as a "policymaking

or confidential employee," see Kinsey v. Salado Indep. Sch.

Dist., 950 F.2d 988, 995 (5th Cir. 1992), whose position required

close working relations with the Board of Selectmen, including

Steeves, we cannot assume, absent some showing by defendants,

that the erosion of their working relationship was due to O'Con-

nor's protected speech. See Brasslett, 761 F.2d at 845-46

("defendants must show that . . . [plaintiff's] allegedly pro-

tected activity had a detrimental impact on" working relation-

ships) (emphasis added); see also Versarge, 984 F.2d at 1367-68

26

(declining to consider disruptive effects of speech that was not

alleged by defendants as grounds for plaintiff's expulsion).

One final point warrants mention. As the district

court properly noted, O'Connor failed on several occasions to

publicize his allegations of Steeves' misconduct directly to the

community; instead, he chose to direct his disclosures to the

Board of Selectmen.9 Nevertheless, the decision to disclose his

allegations to the Board, rather than the community at large, did

not eliminate O'Connor's First Amendment interest in speaking

out. See, e.g., Givhan v. Western Line Consol. Sch. Dist., 439

U.S. 410, 415-16 (1979) (employee retains personal First Amend-

ment right to comment on issues of public concern, even if

comments are made in private; "[n]either the Amendment itself nor

our decisions indicate that [the right to speak out is] lost to

the public employee who arranges to communicate privately with

his employer rather than to spread his views before the public");

see also Rankin, 483 U.S. at 378 (private comment to co-worker

held protected under Pickering balance). Moreover, in addition

to controlling O'Connor's employment, the Board of Selectmen is

the Town's highest elective body, with representative responsi-

bility for acting in the best interests of the Town and its

citizenry. Hence, O'Connor's decision to address the Board,

9Although O'Connor raised allegations against Steeves' at
several "public meetings" prior to July 1990, the district court
noted that few, if any, members of the public attended these
meetings. O'Connor also published several internal memoranda, on
Department stationery, discussing misuse of Department accounts,
but the memoranda did not mention Steeves.

27

rather than the community at large, was no mere private communi-

cation, nor did it in any sense extinguish the inherent public

interest in his disclosures of Steeves' alleged misconduct.10

Everything considered, and viewing the record in the light most

favorable to O'Connor, we are unable to conclude that the Town's

interest in suppressing O'Connor's speech outweighed the impor-

tance of the legitimate public interest in O'Connor's disclo-

sures.11

10Indeed, a public employee, whose disclosures have the
potential to disrupt the employing agency or department, may act
responsibly by taking steps to minimize disruption by limiting
dissemination to the public authorities most directly concerned.
See Rankin, 483 U.S. at 389 (noting that employee "had [not] dis-

credited the office by making her statement in public," where
offensive remark "was evidently made in a private conversation
with another employee"); Hubbard v. E.P.A., 949 F.2d 453, 458

(D.C. Cir. 1991) ("This case does not present a situation in
which a government employee has jeopardized an employer's opera-
tion by calling a press conference or indiscriminately leaking
sensitive information"); Breuer, 909 F.2d at 1042 (finding

employee's statements on official corruption unprotected, despite
the fact that the employee "may have genuinely hoped to force the
sheriff to make changes for the ultimate benefit of the Depart-
ment," because the employee's "method . . . was to immerse
himself in an intra-departmental contest with the sheriff");
Conaway, 853 F.2d at 798 ("[t]he relatively low key context in

which [the public employee] voiced his complaints further per-
suades us that the Pickering balance tilts in his favor").

11As the district court determined, however, O'Connor's
claims against the Selectmen must be dismissed on the ground of
qualified immunity. Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982). "Because Pickering's constitutional rule turns upon a

fact-intensive balancing test, it can rarely be considered
'clearly established' for purposes of the Harlow qualified

immunity standard," at least where substantial disruption has
been shown to exist as a basis for the discharge. Bartlett v.

Fisher, 972 F.2d 911, 916-17 (8th Cir. 1992) (collecting cases).

See also Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir. 1992)

("if the existence of a right or the degree of protection it
warrants in a particular context is subject to a balancing test,
the right can rarely be considered 'clearly established,' at
least in the absence of closely corresponding factual or legal

28

5. Causation

The Town may have reserved its strongest defense for

the next round. On the record before us, O'Connor would have

grave difficulty demonstrating that the protected speech was a

"substantial or motivating" factor in his discharge by the Town.

Mt. Healthy, 429 U.S. at 27412. O'Connor's alleged lack of

qualifications for the Superintendent's position, combined with

the public concern over the Town water crisis, may well have

provided neutral, non-speech related reasons for Edwards' and

Steeves' votes against O'Connor's retention. Unless O'Connor can

present evidence demonstrating that the discharge was motivated

by his protected speech, the Town may yet be entitled to judgment

precedent").

12The purpose of the Mt. Healthy test is to ensure that the

employee is not placed

in a better position as a result of the exer-
cise of constitutionally protected conduct
than he would have occupied had he done
nothing . . . . A borderline or marginal can-
didate should not have the employment ques-
tion resolved against him because of consti-
tutionally protected conduct. But that same
candidate ought not to be able, by engaging
in such conduct, to prevent his employer from
assessing his performance record and reaching
a decision not to rehire on the basis of that
record, simply because the protected conduct
makes the employer more certain of the cor-
rectness of its decision.

429 U.S. at 285-86. Here, O'Connor's last-minute public revela-
tion of Steeves' purchasing practices, at the July 10 Board
meeting, suggests the precise situation which Mt. Healthy sought

to avoid: an effort by O'Connor (when his discharge appeared
inevitable) to place himself "in a better position" to raise a
later constitutional challenge to his discharge.

29

under the Mt. Healthy test. We are not in a position to make

this determination, however, as the Town assumed, for summary

judgment purposes, a causal link between the protected speech and

O'Connor's subsequent discharge.

III

CONCLUSION

As political affiliation was an appropriate qualifi-

cation for the Superintendent position, we affirm the grant of

summary judgment for the Town on O'Connor's political discharge

claim. The judgment dismissing all claims against the individual

defendants on the grounds of qualified immunity is likewise

affirmed. Finally, we vacate the summary judgment dismissing

O'Connor's "whistleblowing" claim against the Town, and remand

for further proceedings consistent with this opinion.

The judgment of the district court is affirmed in part,

vacated in part, and the case is remanded for further proceedings

consistent herewith. Costs are awarded to the individual defen-

dants. The appellee Town and appellant O'Connor shall bear their

own costs.
own costs.

30