

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-1995

# Watters v Phila

Precedential or Non-Precedential:

Docket 94-1711

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Watters v Phila" (1995). *1995 Decisions.* Paper 150.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/150

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-1711


RICHARD C. WATTERS,
                              Appellant
            v.

CITY OF PHILADELPHIA;
W. WILSON GOODE, HONORABLE, Individually, and in his
capacity as Mayor of the City of Philadelphia;
WILLIE L. WILLIAMS, HONORABLE, Individually, and in his
capacity as Police Commissioner of the
Philadelphia Police Department;
DAVID H. PINGREE, HONORABLE, Individually, and in his
capacity as Managing Director of the City of Philadelphia


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 91-cv-00177)


Argued:  February 28, 1995

Before:  SLOVITER, Chief Judge,
NYGAARD and McKEE, Circuit Judges

(Filed  June 2, l995 )


Geoffrey R. Johnson (Argued)
Richard A. Sprague
Joseph R. Podraza, Jr.
Sprague & Sprague
Philadelphia, PA  19103

        Attorneys for Appellant

Alan C. Ostrow (Argued)
Deputy City Solicitor
Lek Domni
Michael F. Eichert
Chief Deputy City Solicitor, Appeals
City of Philadelphia
Law Department
Philadelphia, PA  19107-2996

          Attorneys for Appellees

_____

OPINION OF THE COURT
_____


SLOVITER, Chief Judge


        Richard C. Watters appeals the district court's order under Rule 50(a) dismissing his action under 42 U.S.C. § 1983 against the City of Philadelphia, Police Commissioner Willie L. Williams and Managing Director David Pingree (hereafter collectively referred to as "the City") for denial of his First Amendment right to freedom of speech.  Watters' claim arose out of his termination from employment as Manager of the Employee Assistance Program (EAP) for the Philadelphia Police Department following the publication of a newspaper article in which he was quoted criticizing aspects of the EAP.

**I.**

**FACTS AND PROCEDURAL HISTORY**

        In 1987 then-Police Commissioner Kevin Tucker solicited Watters to leave his employment with the Princeton Medical Center and to accept a position as Manager of the Employee Assistance

Program for the Philadelphia Police Department.  The idea for a coordinated EAP grew out of a study conducted by the Philadelphia Police Study Task Force which Tucker had convened "to review all aspects of the Philadelphia Police Department and to make recommendations . . . for improvement in the way this vital service is provided to the citizens of Philadelphia."  App. at 30.

The Task Force's report, Philadelphia and Its Police: Toward a New Partnership, issued in 1987, emphasized the importance of providing stress management and psychological, drug and alcohol counseling services to officers.  The Task Force found "significant barriers and limitations" in the existing counseling programs and noted the lack of a "clear commitment" by the Department to an employee assistance program, "the lack of a comprehensive program for assisting employees with alcohol, drug or psychological problems, and police employees' suspicions of treatment programs, including fear of being dismissed, disciplined or stigmatized."  App. at 44.  The Task Force concluded that "procedures must be established that allow an officer to be referred to treatment before the problem gets out of hand [and that a] key to convincing employees that they can get help is for the Department to ensure the confidentiality of the program. . . ."  App. at 44.  The Task Force specifically recommended hiring a "program coordinator with psychological

counseling training" and developing a formal employee assistance policy. App. at 45.

Watters was charged in his appointment letter with managing the EAP "as outlined in the recommendations of the Philadelphia Police Study Task Force Report." App. at 123. The defendants do not deny that pursuant to that charge Watters upgraded and consolidated existing services, added educational programs, and supervised the professional training of the counselors. Again following the Task Force's recommendations, he oversaw the formation of internal and external advisory committees to draft an employee assistance policy. One draft policy statement addressed issues of confidentiality and specified the services the EAP would provide. App. at 51-52. Another outlined a Traumatic Incident Management Program. App. at 53-55.

The genesis of Watters' employment problems apparently lay in his attempts to get formal and public acceptance of those policy statements by the Police Commissioner. Watters submitted the draft policy statements to Commissioner Tucker in 1988 for his approval. Tucker told Watters orally to implement the services. He testified that he approved the goals Watters had set but that in light of his forthcoming retirement he deferred decisions on a formal policy to his successor. Tucker resigned in June 1988 and was succeeded by Commissioner W. Willie Williams.

Watters then sought formal approval of the draft policies from Williams but was again disappointed. Williams testified that he told Watters that it might take up to eighteen months to get consensus on the policy issues but that Watters had the authority to do whatever was necessary in the meantime to run the EAP. App. at 605-06.

According to Watters, the lack of official policies caused problems in at least two areas -- one dealing with maintaining confidentiality as to the identity of police officers who sought counseling and the other dealing with reimbursement for certain services referred to providers by the EAP rather than by the City's workers' compensation program. Explaining the reason for his concern about confidentiality, Watters testified, "[O]ne of the counselors . . . made it clear that if a police officer were to have revealed to him that he had a chemical dependency problem, that he would Mirandize him, he would arrest him." App. at 189. Defendants maintain that confidentiality was protected unless an officer posed a danger to himself or others. There is evidence in the record that existing departmental policy required reporting any police officer who was using drugs. App. at 181-82.

Watters also described difficulties with reimbursement for an outside referral. He stated: "I received a letter from the police department safety officer telling me that the police department would not reimburse this employee for those services

because the employee assistance program did not have a mandate to act in that capacity." App. at 214. According to Watters, some officers viewed the EAP with mistrust and challenged him every day with questions about its legitimacy. They told him that the EAP was a "bogus program" because "without the authority authorization [sic] of the policy statement, it was meaningless." App. at 220.

Watters' dissatisfaction with managing the EAP without the policy statements grew. He was concerned "[t]hat we were operating in an unethical way. That we were viewed as having some service that didn't exist. That I would be responsible or liable for supervising or directing a program that wasn't authorized to exist." App. at 219. In August 1989, Watters wrote to Chief Deputy Solicitor Ralph J. Teti seeking guidance about the legal and ethical difficulties he perceived in providing the EAP services without a signed policy statement. App. at 220-22.

In November 1989, because of his concerns over the lack of formal Departmental policies, Watters decided to scale back the EAP services to the level they were prior to his becoming the EAP manager. App. at 228-29, 234-35. Watters testified that he informed Commissioner Williams and Deputy Commissioner James Clark of his decision. Clark instructed Watters to continue providing the services but Watters responded that he could not ethically do so. App. at 230-32. Shortly thereafter Watters

refused to provide referrals for outside counseling for the family of a slain officer because he believed that, without a clear policy mandate, the referral could interfere with the family's receipt of workers' compensation benefits.  App. at 232-34.  He was not disciplined for this refusal to provide referral services.  App. at 234.

In April 1990, a reporter for The Philadelphia Inquirer approached Watters with questions about the EAP.[1]  On April 19, 1990 an article appeared in that newspaper under the headline "Dispute puts counseling program for police in limbo."  The article states that "[the EAP] has ground to a virtual standstill in the services it offers, stymied by an internal dispute over the scope of its effort."  The article continues, "According to Dick Watters, the head of the Employee Assistance Program, the turmoil has its roots in the way the program was set up--the department, he said, never formally authorized counseling for anything but alcohol problems" and "What has frustrated program counselors, Watters said, is that authorization is crucial to effective service.  Without it, he said, there have been problems of liability, difficulties in worker's compensation cases and snafus in reimbursement for care referrals, all of which have undercut the coordinated system of service envisioned by the task

_____

[1].  This was actually the second newspaper article for which Watters was interviewed.  On December 13, 1989 The Northeast Times published an article in which Watters discussed the lack of a policy statement.  No discipline resulted from this interview.

force."  The article continues, (quoting Watters): "'It's been a charade from the start.'--so he decided to pull the plug to make a point.  'I'm taking a risk.  We're creating a crisis.  The program's not here.  Somebody's got to make a decision.'"  App. at 56.  Watters agreed at trial that in general the reporter accurately paraphrased him, but noted that he did not say that he "pulled the plug to make a point."

As soon as the article was published, Williams summoned Watters to his office.  Watters claims that Williams told him that he should not have talked to the reporter and that he was an abomination and unfit for public service.  App. at 242-44.  On April 26, 1990, Watters was again summoned, and this time was informed of his termination.

Williams testified that the April 19 article was his first knowledge that the EAP services had been cut back, and that at his meeting with Watters immediately thereafter he asked whether and why he had reduced services and who had given him the authority to do so.  He testified that Watters admitted that he had made the statement that he "pulled the plug" and said that he had stopped providing crisis counseling and the morning information meetings because he felt he lacked authority.  It was Williams' view that "[Watters] was obligated as a city employee to provide those services."  App. at 627.

Williams also discussed the article with Managing Director David Pingree, who testified that Williams was concerned

that Watters had taken actions to hinder the operation of the EAP but "I don't recall the Commissioner being concerned relative to Mr. Watters speaking to the press." App. at 719. Pingree suggested that Williams should look into whether services had been reduced. Williams verified that some services had been stopped and recommended firing Watters, which Pingree authorized. Six months later, Williams issued two written policy statements. One was entitled "Employee Assistance Program for Sworn Personnel And Their Families," and was substantially similar to that proposed by Watters. The other which mandated counseling for any officer involved in a police shooting, also addressed issues Watters had raised. App. at 633-35.

Watters filed his section 1983 suit against the City of Philadelphia, Mayor W. Wilson Goode, Police Commissioner Williams, and Managing Director Pingree claiming violations of the due process and freedom of speech clauses of the United States Constitution. The district court granted defendants' motion for judgment as a matter of law after the close of evidence at trial,[2] holding that Watters' speech was not on a matter of public concern and that the "speech activity interfer[ed] with the Police Department's interests in promoting the efficiency of the public services it performs through its employees." App. at 756-58.

---

[2]. On April 25, 1991 the district court had granted defendants' motion to dismiss the due process claim and all claims against Mayor Goode. Watters does not appeal those rulings.

We exercise plenary review of the district court's grant of a motion for judgment as a matter of law. Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993). Such a motion should be granted only if "viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." Id. (citation and quotation omitted). This court has an obligation to make an "'independent constitutional judgment on the facts of the case'" as to whether the speech involved is constitutionally protected. Connick v. Myers, 461 U.S. 138, 150 n.10 (1983) (quoting Jacobellis v. Ohio, 378 U.S. 184, 190 (1964) (opinion of Brennan, J.)).

**II.**

**DISCUSSION**

The Supreme Court has remarked that it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal. See Pickering v. Board of Educ., 391 U.S. 563, 572 (1968). Judicial vigilance is required to ensure that public employers do not use their authority to silence discourse on matters of public concern simply because they disagree with the content of the employee's speech. See Rankin v. McPherson, 483 U.S. 378, 384 (1987). Nonetheless, our precedents counsel that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with

regulation of the speech of the citizenry in general." Pickering, 391 U.S. at 568. Therefore, in determining whether the speech of an employee deserves constitutional protection, this court must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.

We analyze a public employee's claim of retaliation for engaging in protected activity under a three-step process. First, plaintiff must show that the activity in question was protected. Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993); Czurlanis v. Albanese, 721 F.2d 98, 103 (3d Cir. 1983). To be protected the speech must be on a matter of public concern, and the employee's interest in expression on this matter must not be outweighed by any injury the speech could cause to the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees. Waters v. Churchill, 114 S. Ct. 1878, 1884 (1994) (plurality opinion) (citing Connick, 461 U.S. at 142, and Pickering, 391 U.S. at 568).

Second, plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). Finally, defendant may defeat plaintiff's

claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct.  Id.

In this case we need not reach the latter two steps. The district court found that Watters had made a sufficient showing that the speech was a substantial factor motivating the termination to submit the question of the actual reason for Watters' termination to the jury.  App. at 754.  The only question before this court is the legal one of whether the district court erred in its determination that Watters' speech was not a matter of public concern and that it interfered with the Police Department's efficient delivery of services.  By arguing that the speech was of no public interest or that it was of "low public interest" and was outweighed by the City's countervailing interest in requiring loyalty of Watters, the City appears to concede, at least for purposes of this appeal, that the speech was a motivating factor in Watters' termination.[3]

**A.**

**Matter of Public Concern**

---

[3].  Whether the speech was a substantial factor in the retaliatory action and whether Watters would have been fired anyway remain issues in contention between the parties.  See Johnson v. Lincoln University, 776 F.2d 443, 454 (3d Cir. 1985) ("second and third questions . . . should be submitted to the jury"); see also Zamboni v. Stamler, 847 F.2d 73, 79 n.6, 80 (3d Cir.) ("these inquiries [whether a substantial or motivating factor and whether same actions would have been taken regardless] . . . are for the jury"), cert. denied, 488 U.S. 899 (1988).

The threshold issue is whether Watters' speech was on a matter of public concern.  Swineford v. Snyder County, 15 F.3d 1258, 1270 (3d Cir. 1994).  An employee's speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community."  Holder, 987 F.2d at 195 (citing Connick, 461 U.S. at 146).  Speech by a public employee "as a citizen upon matters of public concern" is distinguished from speech by "an employee upon matters of only personal interest" for which, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  Connick, 461 U.S. at 147.  The public concern inquiry is a legal one, to be determined by the "content, form, and context of a given statement, as revealed by the whole record."  Id. at 147–48 & n.7.

Watters spoke to a reporter with The Philadelphia Inquirer about the grave problems he perceived in operating the EAP without a written policy statement.  The content of Watters' speech on its face appears to address a matter of significant public concern.  There is ample evidence in the record that the existence of an effective EAP had been a matter of public interest for some time.  Former Commissioner Tucker testified that he held a press conference to announce the release of the Task Force's Report.  App. at 586.  Tucker also testified that an

effective EAP would be of economic benefit by decreasing absenteeism and improving the quality of law enforcement. App. at 448-49. Commissioner Williams concurred in the importance of an effective EAP to the smooth functioning of the Police Department.

Watters described the stress faced by police officers and the role of an EAP:

> Police officers were considered extremely important to the city. They offered a very valuable service. They were people who carry guns. They were people who had an enormous responsibility. They were employees who were under an enormous amount of stress, and the discharge of their responsibilities required them to have appropriate kinds of programs available to mediate the stress and to help them deal with whatever problems or personal problems they might have, given certainly their status and their significance within the city structure.

App. at 352.

It follows that the availability and provision of counseling to a troubled police officer for addiction, stress and related disorders, or traumatic incidents is precisely the kind of issue that a citizen of Philadelphia is likely to find of the utmost importance. Indeed, shortly after Watters assumed his duties managing the EAP, he was interviewed by a representative of a "community concern action group" who presented citizen fears that police officers under stress and carrying guns were likely to have some "serious accidents." Watters sought to allay those fears by explaining the availability of counseling services for officers. App. at 201.

Defendants do not deny that the existence of the EAP itself is an issue of public concern. Instead, they seek to distinguish that basic issue from the particular matter Watters protested -- the absence of an official written policy statement on certain troublesome and, in his view, unresolved aspects of the EAP. However, because Watters' speech raised issues which arguably went to the fundamental existence and efficacy of the EAP, that speech cannot be narrowly characterized as only concerning the "minute details" of program administration. Watters sought to inform the public of his belief that "[t]he policy statement would have provided some trust, a certain degree of comfort, a different understanding of what the organization was proposed to do to enable people to access the EAP without fears of recrimination, without fear of having records used against them in an investigation of some kind." App. at 192. If officers did not use the services available, the stated purpose of the program -- to improve the effective delivery of law enforcement to the public -- would be undermined.

Watters' view as to the nexus between written policies and the effectiveness of the EAP has support in the record. A peer counselor for the Philadelphia Police Department, Sergeant William Brennan, testified that formal policies are essential within the Police Department because without them "[y]ou have no real basis for acting." App. at 417. Counsel for the City agreed at oral argument that it was unresolved whether written

policy authorization was required in order for outside referrals by the EAP to be reimbursed.

We need not decide and do not take a position on the question of whether a written policy statement was, in fact, necessary to the effective operation of the EAP, as Watters believed. For this purpose, it is sufficient for us to conclude, that the content of the speech was related to the fundamental existence of the EAP, a matter of public concern.

As such, Watters' speech differs from that at issue in the two cases from other circuits relied on by defendants.[4] Instead, it is comparable as a matter of law to speech by other public employees criticizing their employers' policies or practices which the Supreme Court or this court have found to touch upon matters of public concern. See, e.g., Pickering, 391 U.S. at 566 (letter to the editor criticizing Board of

---

[4]. In Gomez v. Texas Dep't of Mental Health & Mental Retardation, 794 F.2d 1018 (5th Cir. 1986), the speech was that of an employee at a state facility for the mentally ill who informed an employee at a coordinate county facility of proposed administrative changes which would have affected their jobs. The court held that the speech was not of public concern because the proposed reallocation of administrative burdens was not a matter of interest in the community and the speech did not alert the public to wrongdoing or credibly touch upon the adequacy of patient care. Id. at 1021-22. In Phares v. Gustafsson, 856 F.2d 1003 (7th Cir. 1988), a medical records technician disagreed with instructions from her supervisors on coding of medical records. The court found that her speech was not on a matter of public concern because its context and form indicated that it was speech on a purely personal disagreement over the operation of her unit, and the plaintiff was not trying to expose any wrongdoing or to inform the public of any problems within the College of Veterinary Medicine. Id. at 1008.

Education's allocation of school funds); Mt. Healthy, 429 U.S. at 282 (telephone call to a local radio station about memorandum on teacher dress codes); Zamboni v. Stamler, 847 F.2d 73, 75 (3d Cir.) (public criticism of proposed reorganization of prosecutor's office), cert. denied, 488 U.S. 899 (1988); Johnson v. Lincoln University, 776 F.2d 443, 452 (3d Cir. 1985) (letters by university professor to accreditation body alleging low academic standards in university); Czurlanis, 721 F.2d at 100-01 (speeches at Board of Chosen Freeholders meetings criticizing practices of Division of Motor Vehicles); Monsanto v. Quinn, 674 F.2d 990, 996-97 (3d Cir. 1982) (letters to tax commissioner criticizing management of tax division).

The defendants deny that Watters spoke on a matter of public concern and argue that Watters is a disgruntled employee seeking to turn internal office grievances into a cause celebre. They contend that he spoke merely "as an employee dissatisfied with the scope and timing of one aspect of a voluntary police department program because his superiors would not agree with him initially, and did not agree with him as soon as he wanted them to." Appellees' Brief at 17. They rely on the Supreme Court's cautionary statement that the "First Amendment does not require a public office to be run as a roundtable for employees complaints over internal office affairs." Connick, 461 U.S. at 149.

In Connick, the speech in question was that of an Assistant District Attorney who circulated a questionnaire

soliciting the views of her coworkers on office transfer policies, office morale, the need for a grievance committee, their level of confidence in their supervisors, and whether they felt pressured to work in political campaigns. The Court held that only the last question spoke to a matter of public concern, and that the others were merely extensions of the employee's dispute with her superiors over her opposition to being transferred. Id. at 140-49. The questionnaire, "if released to the public, would [have] convey[ed] no information at all other than the fact that a single employee is upset with the status quo." Id. at 148. Myers did not "seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities" or "seek to bring to light actual or potential wrongdoing or breach of the public trust." Id. at 148. Cf. Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410 (1979) (holding that even private communication to supervisors of complaints alleging discriminatory policies and practices entitled to constitutional protection).

The content, form and context of Watters' speech differ greatly. Watters' speech was not confined to the day-to-day minutiae of administering a bureaucratic program, as defendants allege. Rather Watters' speech linked his concerns over the lack of a formal policy to fundamental problems going to the heart of the administration of counseling services for police officers.

Although Watters also may have had some personal motivation for speaking, his speech was not merely an extension of his individual grievances. It had been solicited by a newspaper reporter presumably because the problems it alleged about Police Department administration touched upon issues of "political, social, or other" concern to the community. See Rode v. Dellarciprete, 845 F.2d 1195, 1201-02 (3d Cir. 1988) (clerk-typist who spoke to newspaper reporter about racial animus and retaliation in state police department was "disgruntled employee" but speech was nonetheless on matter of public concern); Zamboni, 847 F.2d at 77-78 (detective who was motivated to criticize reorganization of prosecutor's office in part because it was adverse to him still spoke on matter of public concern). But see Versarge v. Clinton, 984 F.2d 1359, 1365 (3d Cir. 1993) (fact that expelled member of volunteer fire department was motivated by "personal grudge" weighed against finding that he spoke on matter of public concern).

We also attribute some relevance to publication of the interview in a newspaper of general circulation. See Rode, 845 F.2d at 1202; see also Monsanto, 674 F.2d at 997 (holding that speech was matter of public concern supported by fact that issues deemed important enough to be subject of two radio broadcasts). The focus of the article went beyond the personal gripe of one employee, instead putting Watters' statements within the context of reporting on other problems facing the Department. Its lead

was: "As if the Police Department didn't have enough problems, crisis has come to its crisis counselors." App. at 56. It ties Watters' tenure as the EAP Manager to the program itself: "The program's director--hired with much fanfare at the urging of the Philadelphia Police Study Task Force in 1987--has been told by the police commissioner that there is no money to continue funding his job. And the Police Department wants to revamp the program, possibly by farming out services to a private counseling agency." It referred as well to interviews with Commissioner Williams and president of Lodge 5, Fraternal Order of Police, Richard Costello.

The district court too narrowly defined the scope of the public concern doctrine. Surely the citizens of Philadelphia have an interest in knowing if a program set up to provide counseling services to police officers is beset with problems of the magnitude of which Watters, the manager of that program, described. We conclude that the public had a significant interest in learning about problems which may have impaired the effective functioning of the EAP and which, in turn, could have affected the delivery of police services, and that therefore the speech was on a matter of public concern.

**B.**

**Balancing of Interests**

Our conclusion that Watters' speech was on a matter of public concern does not alone determine that the speech was protected by the First Amendment.  We must weigh the interests on behalf of the speech against the interest of the City as an employer "in promoting the efficiency of the public services it performs through its employees."  Rankin, 483 U.S. at 388 (quoting Pickering, 391 U.S. at 568).  The Government bears the burden to justify a discharge, and that burden "varies depending upon the nature of the employee's expression."  Connick, 461 U.S. at 150; see also United States v. National Treasury Employees' Union, 115 S. Ct. 1003, 1021 (1995) (O'Connor, J., concurring in the judgment and dissenting in part) ("As the magnitude of intrusion on employees' interests rises, so does the Government's burden of justification.").  "[T]he balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales."  Zamboni, 847 F.2d at 79 (citation and quotation omitted).

On Watters' side of the balance is his interest in engaging in the speech as well as the public's interest in "free and unhindered debate" on an issue of public importance, see Versarge, 984 F.2d at 1366, a "core value of the Free Speech Clause of the First Amendment."  See Pickering, 391 U.S. at 573. As previously recognized, "[t]he public has a significant

interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of . . . public officials."  O'Donnell v. Yanchulis, 875 F.2d 1059, 1062 (3d Cir. 1989).

Weighed on the other side is the government employer's interest in "the effective and efficient fulfillment of its responsibilities to the public."  Connick, 461 U.S. at 150.  As explained recently in the plurality opinion of the Supreme Court in Waters v. Churchill, 114 S. Ct. 1878, 1886 (1994), the government "has a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large[,]" but that hand is not uncontrolled.

In Waters, the Supreme Court's most recent discussion of this issue, the Court considered whether the Connick test should be applied on the basis of what the government employer reasonably thought the employee said or what the trier of fact ultimately determines was said.  In that case, unlike here, there was a factual dispute as to what was said[5] in a conversation

---

[5].  Only a few phrases in The Philadelphia Inquirer article may have been incorrectly attributed to Watters.  For example, the article describes how "[f]or more than three months, the program has stopped the informal counseling it offered routinely to officers involved in shootings--and has cut back counseling in virtually every area but alcohol abuse."  App. at 56.  Watters denied having said exactly these words but testified at trial "I told him that the service were cut back to the ones that I had proposed and that had never been authorized and to the services that existed before I inherited the counseling unit, and that the alcohol counseling unit continued to exist."  App. at 353.  Watters does not deny saying most of what was in the article.

between two nurses during a dinner break.  The employer acted on the basis of information that the disciplined employee had said "unkind and inappropriate negative things" about her supervisor; the employee contended she had merely criticized certain hospital policies because she believed they were impeding nursing care. Id. at 1882-83.

In an opinion authored by Justice O'Connor, the Waters plurality, speaking on this issue for a majority of the Court, id. at 1893 (Souter, J., concurring), held that the courts should "look to the facts as the employer reasonably found them to be." Id. at 1889.  The Court then applied the Pickering balance and decided that, in either event, the speech was unprotected because whatever First Amendment value it might have had was outweighed by the disruption factor.  Id. at 1890-91.

We must consider the effect of Waters on our prior standard for evaluating the disruption factor relevant in the Pickering balance.[6]  In earlier cases, we required the government employer to show "actual disruption."  See Zamboni, 847 F.2d at 78 (citing American Postal Workers Union v. United States Postal Service, 830 F.2d 294, 303 & n.12 (D.C. Cir. 1987)).  In doing so, we relied on the language in Pickering that the speech in question was "neither shown nor can be presumed to have in any

---

[6]. In Feldman v. Philadelphia Hous. Auth., 43 F.3d 823 (3d Cir. 1994), decided after Waters, although there was evidence of some actual disruption, we held it did not justify plaintiff's firing because it was outweighed by the public interest in retaining someone whose job was to expose corruption.  Id. at 830-31.

way either impeded the teacher's proper performance or to have interfered with the regular operation of the schools generally." See Zamboni, 847 F.2d at 79 (quoting Pickering, 391 U.S. at 572-73).

In Waters, however, the Court decided that "the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had." 114 S. Ct. at 1890. Justice O'Connor explained that because a government employee, like any citizen, may have a strong, legitimate interest in speaking out on public matters, the government employer may have to "make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." Id. at 1887 (emphasis added). We believe that after Waters, it is no longer essential to show actual disruption, although such evidence would obviously be highly relevant. See Jeffries v. Harleston, No. 93-7876, 1995 U.S. App. LEXIS 7639, at *10 (2d Cir. April 4, 1995) (Waters overturns strict actual interference test).

The Court's finding of likely disruptiveness in Waters was based on the employer's evidence that a potential employee may have been discouraged in working for a department in the hospital, the disciplined employee's complaints threatened to undermine management's authority, and the employee's own statement that it "wasn't possible" to "wipe the slate clean" between her and her supervisor. 114 S. Ct. at 1890-91. In

Rankin, the Supreme Court listed as factors relevant to evaluating the disruption contention "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  483 U.S. at 388 (citing Pickering, 391 U.S. at 570-73).

The district court in this case did not review or analyze any of these factors.  Instead, in its brief discussion of this side of the Pickering balance[7] the court concluded that

_____

[7].  The court's entire discussion of disruptiveness in its oral opinion is as follows:

> Mr. Watters' statements in the press describe a crisis, and Mr. Watters has testified that at least there was a crisis within the Police Department administration.
>
> The crisis described by Mr. Watters here in court, and in the article, would clearly support a finding and does clearly support the Court's finding that the speech activity interferes with the Police Department's interests in promoting the efficiency of the public services it performs through its employees.
>
> Certainly it is established that there is a crisis. Mr. Watters set out to describe that crisis.  And certainly so that all prongs of the requirements to be protected, First Amendment activity cannot be met.
>
> It is my view that there is no First Amendment protection in the context of -- for the activity in this case.
>
> To create a crisis, then to report it for the purpose of taking the issue public in order to get certain

the speech was disruptive by focusing on Watters' use of the word "crisis" in the article and in his testimony.[8]  However, the crisis to which Watters referred was one in the EAP, not one resulting from his speaking out.

Disruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself.  In Monsanto, reviewing a record similarly lacking evidence of disruption caused by the speech activities of an employee who sent letters critical of the management of the Tax Division of the Virgin Islands Department of Finance, we found it significant that "[w]hile there was ample testimony establishing disharmony and discontent among the employees . . . there is only meager evidence establishing that this disharmony and discontent was specifically caused by [the] letter writing activities. . . . [M]uch of the discontent appears to have been the result of the very problems in the Tax Division to which [the] letters were

(..continued)
administrative orders and procedures is not protected conduct as I understand protected conduct.

App. at 757-58.

[8].  Similarly, although the City also contends that Watters admitted his policy proposals created a "crisis," nothing in the Watters' testimony cited by the City can be construed as attributing any crisis to The Philadelphia Inquirer article. See, e.g., App. at 361 ("The reasons for my not wanting to report to the first deputy commissioner created very much of a crisis trying to interface the employee assistance program connected with other departments within the organization and outside of the organization, with the city health service.").

directed." 674 F.2d at 999. To the extent there might have been "disharmony or discontent" in the Police Department over the functioning of the EAP there is no evidence in the record suggesting that it was a result of Watters' speech rather than of the very problems to which Watters' speech was directed.

The City now seeks to justify the termination of Watters on a basis not relied on by the district court. It contends that Watters was a "policymaker" and, as such, enjoyed a necessarily close working relationship with the Commissioner who had the right to expect personal loyalty and confidence in return. Certainly there are some positions in public employment "in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal" or "in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship." Pickering, 391 U.S. at 570 n.3. On the other hand, merely saying that the relationship will be undermined does not make it so.

The paradigmatic case in which this court concluded that the close working relationship between employee and supervisor made public criticism by the employee disruptive as a matter of law is Sprague v. Fitzpatrick, 546 F.2d 560 (3d Cir. 1976), cert. denied, 431 U.S. 937 (1977). In that case, we

upheld the dismissal of an action based on the firing of the First Assistant District Attorney following an article in The Philadelphia Inquirer in which he sharply disputed the veracity of public statements made by the District Attorney. We reasoned that the comments had been an "irreparable breach of confidence," and noted that "we could not expect a district attorney to run an efficient office if his first assistant were free to impugn his integrity in public." Id. at 565. However, we reached that conclusion based on evidence that the First Assistant District Attorney functioned as a virtual alter ego to the District Attorney. He assisted the District Attorney in formulating policy, administered the office on a daily basis, kept the District Attorney informed about the performance of various units, and acted as the District Attorney when the latter was unavailable. Id. at 562. See also Propst v. Bitzer, 39 F.3d 148, 153 (7th Cir. 1994) (ample corroboration in record of defendant's claim that speech highly disruptive of close working relationships requiring loyalty and confidence), cert. denied, 115 S. Ct. 1400 (1995).

There was no evidence submitted by the City that Watters' relationship with Commissioner Williams was comparable to the "close working relationship" between the District Attorney and his First Assistant. The City does not contend that Watters and Williams interacted on setting policy on the wide range of issues faced by the Department, and indeed the EAP appears to

have been a relatively discrete operation within the Police Department.  See Swineford, 15 F.3d at 1272-73 ("Proximity within an organizational hierarchy is a significant factor in the employer's demonstration that a public employee's speech had a detrimental impact on a necessarily close working relationship."); Zamboni, 847 F.2d at 79 (court must determine "whether [plaintiff's] functional role in the prosecutor's office was of such proximity to [his employer] that his speech destroyed 'a needed close working relationship'").

Watters enjoyed neither the level of authority nor the degree of responsibility exercised by the First Assistant District Attorney in Sprague, and he was further removed in the chain of command, subordinate both to the Police Commissioner and to the First Deputy Commissioner.  Watters was required to abide by the orders of his superiors.  He needed their approval to operate the EAP and, according to his own testimony, was unable to make independent policy judgments.  See Rankin, 483 U.S. at 390 ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.").

Furthermore, nothing Watters was reported to have said "impugn[ed] the integrity" of his superiors.  See Roseman v. Indiana Univ. of Pa., 520 F.2d 1364, 1368 (3d Cir. 1975), cert. denied, 424 U.S. 921 (1976) (significant if speaker "called into question the integrity of the person immediately in charge of

running a department"). The Philadelphia Inquirer article conveys a straightforward difference of opinion over implementation of an important Police Department program. The City has never claimed any disruption from the appearance of similar comments by Watters in the earlier article in The Northeast Times. Nor is there evidence that Watters engaged in the type of complaining and negative criticism of his superiors within the workplace that the Supreme Court found likely to disrupt working relationships in Waters. 114 S. Ct. at 1890–91.[9]

Finally, defendants argue that because of its public safety role, a Police Department has a significantly greater interest in regulating the speech of its employees than do other public employers. See Shands v. City of Kennett, 993 F.2d 1337, 1344 (8th Cir. 1993), cert. denied, 114 S. Ct. 880 (1994); Gasparinetti v. Kerr, 568 F.2d 311, 315–16 (3d Cir. 1977), cert. denied, 436 U.S. 903 (1978). However, Watters was a civilian employee and defendants have not shown why his speech was likely to interfere materially with Department morale or public confidence. See Rankin, 483 U.S. at 388–92 (civilian clerical employee's comment about assassination attempt on President held protected conduct); Zamboni, 847 F.2d at 78–79 (applying

---

[9]. We note that there are no allegations that Watters' speech was knowingly or recklessly false or that his speech was motivated by animus. Different considerations obtain in such a case. See Pickering v. Board of Educ., 391 U.S. 563, 574 (1968); Swineford v. Snyder County, 15 F.3d 1258, 1272 (3d Cir. 1994); Czurlanis v. Albanese, 721 F.2d 98, 106 (3d Cir. 1983).

identical disruption standard for evaluating speech of detective in prosecutor's office as any other public employee); Rode, 845 F.2d at 1202 (comments in newspaper interview by civilian clerical employee of state police department describing racial animus held protected conduct).

In any event, "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 500 (1967). This court and others have recognized that "freedom of speech is not traded for an officer's badge." Biggs v. Village of Dupo, 892 F.2d 1298, 1303 (7th Cir. 1990); see also O'Donnell, 875 F.2d at 1062. Thus we hold that the City did not make the requisite substantial showing that Watters' speech was "in fact, likely to be disruptive," Waters, 114 S. Ct. at 1887, and therefore there was no basis for the district court to hold that Watters' speech disrupted the proper functioning of the Police Department.

In our opinion in O'Donnell, we set forth the appropriate procedure for this court to follow when the facts on record relevant to the application of the Pickering balancing test are undisputed. We stated there,

> when considering the protected status of speech, an appellate court must, in any event, make an independent constitutional judgment on the facts of the case. Connick, 461 U.S. at 150 n. 10, 103 S. Ct. at 1692 n. 10, 75 L. Ed. 2d 708 (1983); Czurlanis, 721 F.2d at 102. Because the undisputed facts in this record dictate only one result, viz., that, on balance, O'Donnell's speech here was protected by the first amendment, we feel obligated to make that determination. We emphasize, however, that our ruling

is based on the undisputed record before us on the issues resolved.

875 F.2d at 1062.

In light of our conclusions that Watters' speech was on a matter of public concern, and that the City has not met its burden to show that the interest in the speech was outweighed by the interests of the City, the outcome of the Pickering balance is clear, and the district court erred in holding that the speech was not protected by the First Amendment.

It does not follow that this mandates a holding that Watters is entitled to judgment. There remain disputed issues as to the reason for his termination. Although the City did not contest on appeal that Watters was fired for his speech, there was some testimony that might allow a jury to find that he was terminated for insubordination because of his actions in unilaterally cutting back certain services provided by the EAP.[10] See Mt. Healthy, 429 U.S. at 287 (1977). Therefore, we rest our decision on the protected status of the speech, the only issue decided by the district court, and express no opinion as to any issue remaining in the district court.

**III.**

**CONCLUSION**

---

[10]. At trial Commissioner Williams testified, "I felt that his employment as a -- continued employment in the City of Philadelphia was not appropriate at this time because of the gross negligence he had now indicated by stopping doing those programs." App. at 629.

For the foregoing reasons, we will reverse the district court's order granting judgment in favor of defendants pursuant to Rule 50(a) and remand to the district court for proceedings consistent with this opinion.